UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

AMANDA WEST,

        PLAINTIFF

v.

TYSON FOODS, INC.,

        DEFENDANT.

CIVIL ACTION NO. 4:05-CV-183M

ELECTRONICALLY FILED

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

      Defendant, Tyson Foods, Inc. ("Tyson"), by counsel, submits the following memorandum in support of its motion for summary judgment on the plaintiff's claims of alleged "hostile environment" sexual harassment and retaliation.

## FACTS

**I.     Tyson and its policies.**

      Tyson owns and operates a chicken processing plant located in Robards, Kentucky. Tyson has a Harassment/Discrimination Policy that it distributes to each of its employees at the beginning of their employment.  *See* Exhibit A.  Pursuant to its policy, employees who believe harassment and/or discrimination has taken place are required to immediately report the facts of the incident and the individuals involved.  *Id.*  Employees are instructed to report the conduct to their supervisor and/or local HR Manager.  *Id.*  Tyson's policy provides two levels of appeal if the employee is not satisfied with the resolution of the complaint.  *Id.*  In addition, Tyson's policy provides that the employee "at any point can contact Tell Tyson First Line at (800) 643-3410 x-7313 and/or report to <u>any</u> of the following individuals if the Team Member feels more

comfortable skipping one or more of the steps." *Id.* (emphasis in original).    The policy then lists a Notification Roster of nine different company officials who may be contacted, and provides the employee with the telephone numbers for the Employment Compliance Department and the Tell Tyson First Line for reporting harassment and/or discrimination. *Id.* Further, the policy identifies the name and telephone numbers for the Shift HR Manager, Plant HR Manager, Assistant Complex HR Manager, Complex HR Manager, Director of HR Operations, and the EEO Specialist, who are identified as harassment investigators who may also be contacted to report harassment and/or discrimination. *Id.*

Tyson also has an attendance policy for new employees. *See* Exhibit B.  Pursuant to this policy, new employees are hired on a ninety day probationary period. *Id.*  During the probationary period, an employee who receives 3 ½ attendance points is subject to termination. *Id.*

## II.     Ms. West's employment with Tyson.

### A.       Ms. West's hiring and orientation.

On or about January 7, 2005, Ms. West filled out an application for employment with Tyson at the local unemployment office.  (West Depo., pp. 14 – 16; Excerpts of Ms. West's deposition testimony are attached hereto at Exhibit C.)  After submitting her application, Ms. West went to Tyson's plant where she was interviewed in a group along with other job applicants by Ralph Guizar, the Employment Manager for Tyson.  (West Depo., p. 16.)  After conducting the interview, Mr. Guizar asked each individual which department and shift they preferred for their initial assignment.  Ms. West wanted to work in the De-Bone Department on second shift. (*Id*. at pp. 16-17.)  Ms. West was hired on a ninety day probationary period, and worked from approximately 1:00 p.m. to 11:00 p.m.  (*Id*. at pp. 17-18.)

Ms. West testified that her first week of employment with Tyson consisted primarily of

orientation, reviewing policies in the handbook and watching training videos.  (West Depo., pp. 24-25.)  During orientation, Tyson conducted training on workplace harassment and discrimination.  (*Id*. at p. 29.)  This training lasted approximately four hours on one day.  (*Id*. at p. 32.)  Ms. West testified that she received Tyson's Harassment/Discrimination policy, that she read the policy, and that she understood the policy when she read and signed it.  (*Id*. at p. 33.)  This portion of the orientation took place on January 10, 2005.  (*Id*. at pp. 34-35.)  Ms. West also testified that during the training on sexual harassment, "they said that anyone that observed anyone being sexually harassed, you were to report it to HR . . .."  (*Id*. at p. 30.)

**B.     Ms. West's first week of employment on the floor.**

After her first week of orientation, Ms. West began working on the floor in the De-Bone Department.  (West Depo., p. 36.)  Ms. West's duties included cutting the chicken breasts in half or into fillet sizes, and then working them up the bone table where they would use scissors and knives to remove the bones from the chicken breasts.  Her other job duties included "pulling tenders," which is where the chicken would come through the assembly line and she would pull the chicken tenders off.  (*Id*. at p. 19.)  Ms. West's supervisors in the De-Bone Department  were Corey Parks and Maria Robinson.  (*Id*. at p. 18.)  Ms. Robinson supervised employees who were working on the De-Bone table, while Mr. Parks supervised employees working on the chicken tenders line.  Upon beginning to work in the plant, Ms. West was trained by Odle "Junior" Stokes and Natasha Brown.  Ms. Brown and Mr. Stokes were trainers, and showed new employees how to perform the actual tasks of de-boning and pulling the chicken tenders.  (Stokes Depo., pp. 3, 6; Excerpts of Mr. Stokes' deposition testimony are attached as Exhibit D.)

Ms. West admits that from the time of her initial interview with Mr. Guizar, through the orientation period at Tyson, nothing occurred that she felt constituted sexual harassment.  (West Depo., p. 39.)  Beginning around the week of January 17, 2005, Ms. West began working on the

floor in the De-Bone Department.  (*Id*. at p. 40.)  Ms. West alleges that various Hispanic employees would make comments such as she had a "nice ass," she had "big boobs" and that she was "sexy."  (*Id*. at pp. 40–41.)  Ms. West also alleges that when she would walk into the De-Bone Department, the Hispanic employees would "whoop and holler," and "wolf whistle."  (*Id*. at p. 41.)  Ms. West further alleges that on occasions they would ask her if she had a boyfriend, and she would tell them no, that she was married, and to leave her alone because she was not interested.  (*Id*. at p. 42.)  Ms. West testified that she did not know the names of any of the individuals who were making the alleged comments.  (*Id.* at p. 41.)  Ms. West testified that during this first week, she mentioned the alleged conduct to a fellow new hire named Andrea Boykin, and another co-worker who was already employed on the line, John Fellows.  (*Id*. at p. 47.)  Ms. West admits that she did not report any of the alleged misconduct to the Human Resources Department at Tyson, nor did she inform any of her supervisors during that first week.  (*Id*. at p. 49.)  In fact, Ms. West testified "I was just thinking, you know, they're just trying to go out with me.  I'm a new girl.  I didn't really take it that seriously the first week."  (*Id*. at p. 48.)

### C.     Ms. West's second week of employment on the floor.

Ms. West alleges that the same conduct that occurred during the first week continued during the second week she worked on the floor.  (West Depo., p. 50.)  She alleges that the Hispanic employees continued to make comments about her breasts and buttocks, told her she was sexy, asked her to go out with them, and asked whether she had a husband or boyfriend. (*Id*.)  Ms. West admits that none of the employees specifically asked her to have sex.

> Q.     . . . [D]id any of them specifically ask you for sex or any type of sexual favors or anything of that nature during the first week?
>
> A.     Not the first two weeks, no, sir.

(*Id.* at p. 51.)  Further, Ms. West admits that none of these individuals physically touched her

during the first two weeks.  (*Id.* at p. 52.)  Ms. West testified that she discussed the alleged comments that occurred during her second week on the floor with her co-workers, Ms. Boykin and Mr. Fellows, but admitted that during her first two weeks of employment she never reported the alleged conduct to her supervisor, to the Human Resources Department at Tyson, or to any of the individuals listed on the notification roster of the sexual harassment policy.  (*Id.* at pp. 52-53.)

### D.    Ms. West's third week of employment on the floor.

Ms. West alleges that the comments and wolf whistles by the Hispanic employees continued during her third week working on the floor.  (West Depo., p. 64.)  She also alleges that during this week she was working on the chicken tenders line when a Hispanic employee named George tried to kiss her on the cheek, asked her to have sex, and made a sexually inappropriate comment to her. (*Id.* at pp. 55-56.)

Ms. West alleges that after the alleged incident with George occurred, she was walking off the floor to go to Human Resources, and Mr. Stokes approached her and asked her what was wrong.  (West Depo., p. 71.)  Ms. West alleges that she told Mr. Parks and Mr. Stokes about George's alleged conduct, and the alleged sexual comments that other employees had been making since she started working on the floor.[1]  (*Id.* at p. 65.)  Ms. West alleges that Mr. Stokes asked her if she wanted to go to Human Resources, and Mr. Parks allegedly said, "Well, let me fix this first."  (*Id* at 72-73.)

Ms. West alleges that Mr. Parks asked her if she wanted to go back to working on the de-bone table, which she alleges was offensive to her because Mr. Parks wanted to move her instead of George.  (West Depo., p. 66.)  Ms. West alleges that she told him "no," because the de-bone

---

[1] Mr. Parks denies Ms. West's account of the meeting, however, for purposes of this motion only, we will assume that Ms. West's version is correct.

table was harder work, and she felt she had earned getting to work on the tender line. (*Id.*) Ms. West, however, admits that Mr. Parks was attempting to move her to an area where she would not have to work with George. (*Id.* at pp. 68-69.) Ms. West also admits that when she told Mr. Parks she did not want to work the de-bone table, he left her on the tenders line, but moved her to an outside line where she would be out in the open. (*Id.*) Ms. West further admits that George did not bother her again during her employment with Tyson. (*Id.*) Ms. West never complained to Mr. Parks about any other alleged sexual harassment. (*Id.* at p. 90.)

### E.  Ms. West's fourth week of employment on the floor.

Ms. West alleges that during the fourth week of her employment, an employee named Samwell came up behind her, put his arm around her so that her buttocks was up against him and kissed her on the face. (*Id.* at pp. 59-60.) Ms. West alleges that she pushed him away from her, and he touched her breasts and grabbed her buttocks as she was walking away. (*Id.*) She alleges that Samwell grabbed her buttocks on another occasion during that same week. (*Id.*) According to Ms. West, there were no witnesses to either of these alleged incidents. (*Id.* at p. 60.)

Ms. West also alleges that two Hispanic men grabbed her buttocks while she was in the locker room. (West Depo., p. 62.) Ms. West admits that she does not know if anyone saw this alleged incident. (*Id.* at p. 64.)

Ms. West alleges that after these alleged incidents, she told Mr. Stokes that things were not getting any better, but she did not specifically tell him about Samwell's alleged actions. (West Depo., at p. 80.) Ms. West admits that she did not tell anyone at Tyson other than her co-workers, John Fellows and Andrea Boykin, about the two Hispanic men allegedly grabbing her buttocks in the locker room. (*Id.* at pp. 86-87.)

Ms. West admits that she never reported either of these alleged incidents to Mr. Parks, the Human Resources Department, or anyone else identified in Tyson's Harassment/Discrimination

policy during her employment.  (*Id*. at pp. 86-87.)  Further, she never used either of the two telephone numbers provided by Tyson to report these incidents.  (*Id.*)

Ms. West's excuse for not reporting these alleged incidents is that she was waiting to hear back from Mr. Parks regarding the prior report she allegedly made during the third week. (West Depo., pp. 76-77, 101.)  Ms. West admits that she knew that pursuant to Tyson's policy she could report the alleged incidents to someone else if she was not satisfied, but says that she believed Mr. Parks was fixing the situation.  (*Id.* at pp. 77-78.)  Ms. West also admits that Ms. Boykin urged her to report the alleged events to her husband, Stephen Boykin, who worked in Tyson's Human Resources Department, but Ms. West did not feel comfortable doing so because she did not know him.  (*Id.* at p. 88.)  In fact, Ms. West admits that because she did not know any of the people in Human Resources, she would not have reported the alleged conduct to any of them!  (*Id.* at p. 89.)

### F.    Ms. West's final week of employment.

Ms. West's last week actually working at Tyson was the week of February 7, 2005. *See* Exhibit E.  On February 9, 2005, Ms. West attended additional sexual harassment training at Tyson.  (*See* Exhibit F; West Depo., pp. 99-100.)  Ms. West admits that during this training employees were told that they could report to Human Resources if they did not feel they were getting results after complaining to their supervisor.  (*Id.* at p. 101.)  Ms. West further admits that at no point during or after this additional training did she tell anyone there that she felt she was being sexually harassed.  (*Id.* at p. 100.)

Ms. West's last day actually working for Tyson was on February 10, 2005. *See* Exhibit E. Ms. West alleges that at approximately 2:00 a.m. she was walking to her car, and a Hispanic man walking behind her made a wolf whistle and then followed her to her car.  (West Depo., p. 96.*)* When she got into her car and locked the doors, the man smiled and walked away. (*Id*.)

Ms. West admits that she did not recognize the man, and also admits that this was the only alleged incident that occurred during her final week of employment.  (West Depo., pp. 98-99.)  Ms. West alleges that this alleged incident was "the straw that broke the camel's back."  (*Id.* at p. 96.)  With the exception of picking up her paycheck on February 18, 2005, Ms. West never came back to work at Tyson after this alleged incident.  (*Id.* at pp. 97, 99.)  Ms. West admits that she never called Tyson to inform the company that she had quit, and simply never came back to work.  (*Id.* at p. 111.)  Ms. West further admits that she did not report the alleged final incident that occurred on her last day of employment to anyone listed in the Harassment/Disciplinary policy, or call either of the telephone numbers provided by Tyson to report harassment/discrimination.  (*Id.* at p. 99.)

### G.    Ms. West's exit interview.

Prior to Ms. West's failure to report back to work, she had accumulated 2.0 points under Tyson's attendance policy during her probationary period.  *See* Exhibit G.  Ms. West was terminated for job abandonment on or about February 17, 2005 after being a "no call, no show" for four days.  *See* Exhibit H.

Ms. West returned to Tyson on payday, February 18, 2005, to pick up her final paycheck. (West Depo., p. 106.)  Ms. West alleges she was told to go to Human Resources, where she met with the Employment Manager, Ralph Guizar, and had an exit interview.  (*Id.* at p. 107.)  Ms. West alleges she reported all of the alleged sexual harassment to Mr. Guizar, and identified George and Samwell.  (*Id.*)  She further alleges that she told Mr. Guizar that she spoke with Ms. Boykin, Mr. Parks, and Mr. Stokes about the alleged harassment, and also reported Mr. Parks supposedly told her, "Well, you are hot."  (*Id.* at p. 108.)  Ms. West testified that she told Mr. Guizar that her husband wanted her to leave because he did not want her to work around "that kind of behavior and activity."  (*Id.* at p. 109.)  Ms. West testified that Mr. Guizar was

apologetic, and told her that he would get to the bottom of it, and investigate after she left.  (*Id.*)[2]

## ARGUMENT

The plaintiff has filed her claims for alleged sexual harassment under both Title VII and the Kentucky Civil Rights Act.  *See generally*, Complaint.   Because the Kentucky Civil Rights Act and Title VII of the Civil Rights Act of 1964 are virtually identical, federal decisions interpreting the federal act are "most persuasive, if not controlling, in interpreting the Kentucky statute."  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000); *Effinger v. Phillip Morris, Inc.*, 984 F. Supp. 1043, 1045 (W.D.Ky. 1997); *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 820 (Ky. 1992); *Hall v. Transit Authority of Lexington*, 883 S.W.2d 884, 886 (Ky. App. 1994).

**I.      Ms. West's sexual harassment claims fail as a matter of law.**

To prove a *prima facie* case of sexual harassment, Ms. West must prove: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) the employer is vicariously liable. *Valentine-Johnson v. Roche*, 386 F.3d 800, 813-14(6th Cir. 2004); *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir. 1997).

In order to prove a claim for actionable hostile environment the employee must be able to show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the employee's employment and create an abusive working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114

---

[2] Mr. Guizar testified that Ms. West refused to give him any names or information regarding the alleged sexual harassment, other than "all the Hispanics were touching her behind."  (Guizar Depo., p. 26; Excerpts from Mr. Guizar's deposition testimony are attached as Exhibit I.)  However, for purposes of this motion only, we will accept Ms. West's version of the meeting as true.

S. Ct. 367, 371, 126 L. Ed.2d 295 (1993). The conduct endured must be severe or pervasive enough that both a reasonable person and the plaintiff would consider the work environment to be abusive and the terms and conditions of employment altered. *Id.* at 21-22.  Offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and condition of employment. *Oncale v. Sundowner Offshore Services, Inc.*, 118 S. Ct. 998, 1003 (1998).

In *Harris*, the Supreme Court directed courts to "look at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris, supra,* 510 U.S. at 23.  Title VII was not enacted to be a general civility code and the Court has created these judicial standards to ensure that it is not treated as such. *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2283-84 (1998).

A.    **Ms. West cannot establish a *prima facie* case of sexual harassment.**

Ms. West's claims of sexual harassment are best analyzed in two parts: (1) the allegations that relate to the first three weeks of her employment, which she claims to have reported to Mr. Parks, and (2) the incidents which allegedly occurred thereafter, which she admittedly did **not** report during her employment.

1.    **Ms. West cannot establish that the alleged conduct that occurred during her first three weeks working on the floor constitutes actionable sexual harassment.**

Ms. West's claims of sexual harassment that allegedly occurred during her first three weeks on the floor were not severe and pervasive and, therefore, fail to rise to level of actionable harassment for several reasons:

First, Ms. West testified that with the exception of the alleged incident involving George, no one ever physically touched her, or asked her for sex or any form of sexual favors.  (West

Depo., pp. 51-52.)  In fact, Ms. West testified that she "really didn't take it seriously" at first. (*Id.* at p. 48.)  *See Highlander v. K.F.C. Nat'l Management*, 805 F.2d 644, 650 (6th Cir. 1986)(no hostile work environment where employee "didn't think it was that big of a deal").

Second, Ms. West admits that prior to the alleged incident involving George, she failed to utilize Tyson's reporting procedures.  (West Depo., pp. 52-53.) *See Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2293(1998) (employees failure to use complaint procedure provided by employer satisfies the affirmative defense against liability of sexual harassment.)

Third, assuming for purposes of this motion that Ms. West's version of her conversation with Mr. Parks is true, it is undisputed that once she informed Mr. Parks of the alleged incident with George, he moved her to an outside line where he could keep an eye on her.  (West Depo., pp. 68-69.)  Ms. West admits that George never bothered her again throughout the remainder of her employment with Tyson.  (West Depo., pp. 68-69.)  *See Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 51 (6th Cir. 1996) (where corrective action ends harassment employer is not liable).

Fourth, Ms. West admits that the alleged harassment did not unreasonably interfere with her ability to perform her work.  (*Id.* at p. 102.)  In fact, she testified that not only was she able to continue to perform her duties at work, she was able to continue to do a good job.  (*Id.*) Accordingly, Ms. West's claims for a hostile work environment fails as it pertains to her first three weeks working on the floor.

> **2.    Tyson is entitled to assert the affirmative defense enunciated in *Burlington* and *Faragher* against Ms. West's claims of harassment that allegedly occurred during her fourth and fifth weeks of employment.**

In establishing the standards for hostile work environment claims, the Court has also held that employers may be held liable for the harassing conduct of its supervisory employees.  *See Burlington Indus., Inc. v. Ellerth*, 118 S. Ct. 2257 (1998); *Faragher v. City of Boca Raton*, 118 S.

Ct. 2275 (1998).  In these companion cases, the Court held that an employer is vicariously liable for actionable hostile environment created by a supervisor with immediate authority over the employee.  *Burlington, supra,* 118 S. Ct. at 2270; *Faragher, supra,* 118 S. Ct. at 2292-93. However, the Court also provided employers with an affirmative defense to such claims when the hostile environment does not result in a tangible employment action being taken against the employee.  The employer must show (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm.  *Id.*  An employer may use the existence of a "suitable" anti-harassment policy with a complaint procedure to meet his burden under the first element, and proof that an employee "unreasonably" failed to use the complaint procedure provided by the employer will normally suffice for the second element.  *Id.*  This affirmative defense, however, is unavailable when the hostile environment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment. *Id.*

Ms. West asserts a claim for supervisory sexual harassment, but her claim fails as a matter of law.  Ms. West attempts to establish that George and Samwell were supervisors by alleging that they were line leads, which she considered to be supervisors.  (West Depo., pp. 55-56.)  However, the term supervisor "has a specific meaning for purposes of Title VII. A supervisor is one with 'the power to directly affect the terms and conditions of the plaintiff's employment,' not simply one with 'authority to oversee aspects of another employee's job performance.' " *Velez v. City of* Chicago, 442 F.3d 1043, 1047 (7th Cir. 2006), *quoting, Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004).  "The definition adopted by most courts . . . considers a supervisor to be a person with immediate or successively higher authority

over the employee who exercises significant control over the employee's hiring, firing, or conditions of employment." *See Browne v. Signal Mountain Nursery, L.P.*, 286 F. Supp.2d 904, 912 (E.D. Tenn. 2003) *citing Parkins v. Civil Constructors of Ill. Inc.*, 163 F.3d 1027, 1033 (7th Cir. 1998); *Stevens v. United Postal Serv.*, 2001 WL 1298955 (6th Cir. 2001).   Ms. West admits that the line leads did not have the ability to hire or fire.  (*Id.* at p. 58.) Further, Ms. West testified that any disciplinary actions would have been handled by Mr. Parks or Ms. Robinson, and that the line leads would simply report any problems to them.  (*Id.*)  Thus, by Ms. West's own admissions, George and Samwell are not supervisors under Title VII.  Therefore her claims for alleged sexual harassment must be analyzed as claims for alleged co-worker harassment, not supervisor harassment.

Even if the Court were to hold that George and Samwell are supervisors, Tyson would be entitled to the affirmative defense set forth in *Burlington and Faragher* because Ms. West did not suffer a tangible employment action.  *See Burlington, supra,*  118 S. Ct. at 2270; *Faragher, supra,* 118 S. Ct. 2292-93.  Ms. West attempts to show that she suffered a tangible employment action by alleging that she was constructively discharged.  *See*  Complaint, ¶¶ 10, 18, and 31.

The Supreme Court has held that an employer may be held liable for an employee's alleged constructive discharge in a sexual harassment claim where the supervisor's "official act" precipitates the constructive discharge.  *Pennsylvania State Police v. Suders*, 124 S. Ct. 2342, 2351 (2004).  When there is no "official act," such as a demotion or a reduction in compensation that leaves the employee with no alternative other than to resign, the employer is entitled to assert the affirmative defense available under *Burlington*  and *Faragher.  Id.* at p. 2355.  Ms. West admits Tyson never changed her pay, working hours, or her job duties.  (West Depo., p. 117.)  Accordingly, she cannot establish that an "official act" resulted in her constructive

discharge.[3]  Thus, Ms. West has not suffered a tangible employment action, and Tyson is entitled to assert the affirmative defense in *Burlington* and *Faragher*.

Under *Burlington* and *Faragher*,  an employer can defeat a plaintiff's claim for alleged sexual harassment if it can show (1) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm.  *Burlington, supra,* 118 S. Ct. at 2270; *Faragher, supra,* 118 S. Ct. at 2292-93.  An employer may use the existence of a "suitable" anti-harassment policy with a complaint procedure to meet his burden under the first element, and proof that an employee "unreasonably" failed to use the complaint procedure provided by the employer will normally suffice for the second element.  *Id.*

As indicated above, Tyson has a Harassment/Discrimination policy which it provides to its employees. *See* Exhibit A.  Employees are instructed to report the conduct to their supervisor and/or local HR Manager.  *Id.*  Further, Tyson's policy provides that the employee "at any point can contact Tell Tyson First Line at (800) 643-3410 x-7313 and/or report to <u>any</u> of the following individuals if the Team Member feels more comfortable skipping one or more of the steps." *Id.* (emphasis in original).   The policy then lists a Notification Roster of nine different company officials who may be contacted, and provides the employee with the telephone numbers for the Employment Compliance Department and the Tell Tyson First Line for reporting harassment and/or discrimination.  *Id.*  Finally, the policy identifies the name and telephone numbers for six individuals who are identified as harassment investigators who may also be contacted to report harassment and/or discrimination.  *Id.*  Ms. West testified that she received approximately four hours of training on sexual harassment during her orientation at Tyson, and also received

---

[3] See Section III, *infra.* regarding the invalidity of Ms. West's constructive discharge claim as a whole.

additional sexual harassment training on February 9, 2005, two days before she quit.  (West Depo., pp. 32, 99-100.)  Thus, Tyson satisfies the first element of the affirmative defense.

Ms. West unreasonably failed to report the alleged conduct that occurred during the fourth and fifth weeks of her employment.  Ms. West admits that she did not report the incidents that allegedly occurred during her fourth and fifth week of employment to anyone identified in Tyson's Harassment/Discrimination policy, or call either of the two telephone numbers available to her for reporting harassment and/or discrimination during her employment.  (West Depo., pp. 86-87, 99.)  Rather, Ms. West alleges that she was waiting to hear back from Mr. Parks regarding her alleged earlier complaint.  (*Id.* at pp. 76-77, 101.)  Clearly, it was unreasonable for Ms. West to fail to report incidents of alleged physical conduct because she was waiting to hear back on her complaints of what could at best be described as inappropriate and/or vulgar comments.  In fact, the unreasonableness of Ms. West's failure to report these incidents is obvious from her admission that during her orientation training, and the training she received on February 9, 2005, she was informed that she should report any sexual harassment to Human Resources, and that she could report to Human Resources if she did not feel that she was getting the desired results from her complaint to her supervisor.  (*Id.* at pp. 30, 101.) Ms. West failed to do either.  Further, Ms. West admits that her co-worker, Ms. Boykin, told her to go to Human Resources and talk to her husband Stephen Boykin, but she declined to do so.  (*Id.* at p. 88.)  Finally, Ms. West admits that because she did not know any of the people in Human Resources, she would not have reported the alleged misconduct to any of them under any circumstances.  (*Id.* at p. 89.)  Thus, Ms. West unreasonably failed to take advantage of the preventative and corrective opportunities provided by Tyson, and her claim fails as a matter of law.

Based on the foregoing, Ms. West cannot prove her claims of hostile work environment

sexual harassment, and her claims must be dismissed as a matter of law.

II.     **Ms. West's retaliation claims fail as a matter of law.**

Ms. West also alleges that she was subjected to unlawful retaliation in violation of both Title VII and the Kentucky Civil Rights Act. *See* Complaint, Counts II and IV.

Ms. West's retaliation claim is based on her alleged reporting of the incident involving George to Mr. Parks. Ms. West alleges that when she reported the alleged incident involving George, Mr. Parks allegedly laughed and said, "Well, you are hot, you know." (West Depo., at pp. 66, 117-18.) Further, Ms. West alleges that in response to her complaint, Mr. Parks asked her if she wanted to move back to the de-bone table, which she alleges was offensive because it was harder work than pulling chicken tenders, and she felt she earned working on the tender line. (*Id.* at pp. 115-16.) Finally, Ms. West alleges that Mr. Parks failed to report the alleged harassment or correct it. (*Id.* at p. 116.)

Ms. West's claims for retaliation fail as a matter of law. First, Ms. West failed to bring a charge of discrimination for alleged retaliation with the EEOC. Thus, the Court lacks subject matter jurisdiction over her Title VII retaliation claim, and her claim fails as a matter of law. Second, while the Kentucky Civil Rights Act does not require that Ms. West exhaust her administrative remedies prior to filing suit, she cannot prove that she suffered an adverse action for her alleged complaint of sexual harassment. Accordingly, Tyson is entitled to summary judgment on Ms. West's claims for alleged retaliation under both Title VII and the Kentucky Civil Rights Act.

A.      **The Court lacks subject matter jurisdiction over Ms. West's Title VII retaliation claim, therefore her claim fails as a matter of law.**

Federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the claim can reasonably be expected to

grow out of the EEOC charge.  *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 544-45 (6th Cir. 1991).  Generally, retaliation claims are excepted from the filing requirements because the alleged conduct typically occurs **after** the EEOC charge is filed.  "However, this exception to the filing requirement does not apply to retaliation claims based on conduct that occurred **before** the EEOC charge was filed." *Albeita v. TransAmerica Mailings, Inc.*, 159 F.3d  246, 255 (6th Cir. 1998)(emphasis added), *citing Ang*, *supra*, 932 F.2d at 547.  Thus, in cases where the alleged retaliatory conduct occurs prior to the filing of the EEOC charge, the Court does not have subject matter jurisdiction over the retaliation claim if it is not filed with the EEOC.  *Id.*

In the instant case, Ms. West's employment with Tyson ended on or about February 18, 2005.  Ms. West filed her Charge of Discrimination with the EEOC on March 30, 2005.  *See* Exhibit J.   As in  *Albeita*, the "retaliation" box is not checked on Ms. West's Charge of Discrimination and the factual allegations of the Charge of Discrimination do not indicate that she might have a retaliation claim.  *See* Exhibit J; *Albeita*, 159 F.3d at 255.  Each of the acts Ms. West alleges constitutes a claim for retaliation occurred well before she filed her charge of discrimination with the EEOC.  Accordingly, the Court lacks subject matter jurisdiction over Ms. West's Title VII retaliation claim, and her claim must be dismissed as a matter of law.  *Albeita, supra*, 159 F.3d at 255.

> **B.**     **Because Ms. West did not suffer an adverse action, her retaliation claim under the Kentucky Civil Rights Act fails as a matter of law.**

The Kentucky Civil Rights Act provides:

> It shall be an unlawful practice for a person, or for two (2) or more persons to conspire:
>
> (1) To retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter;

KRS 344.280(1).  Like her claims for sexual harassment, Ms. West's retaliation claim under the Kentucky Civil Rights Act is analyzed consistent with federal law.  *See Brooks v. Lexington-Fayette Urban County Hous. Auth.*, 132 S.W.3d 790, 802 (Ky. 2004).

In order to prove a *prima facie* case of retaliation, Ms. West must prove: (1) she engaged in a protected activity; (2) Tyson knew that she engaged in a protected activity; (3) Tyson subsequently took an adverse, retaliatory action against her, or she was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) the protected activity and the adverse action were causally connected.  *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736 (6th Cir. 2006), *citing Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006).  "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington North*, 126 S. Ct. 2415.  Prohibited actions are those that are "likely to deter victims of discrimination from complaining to the EEOC, the courts, and the their employers.  And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence."  *Id.*

None of these alleged incidents Ms. West identifies resulted in a materially adverse action and, thus, Ms. West's claim fails as a matter of law.  First, Ms. West admits that once she told Mr. Parks she did not want to move to the de-bone table, he placed her in exactly the spot she wanted.  (West Depo., p. 116.)  Second, assuming for purposes of this motion that Ms. Parks did state that Ms. West was "hot," the comment was simply boorish, and  the Court has held that "petty slights, minor annoyances, and simple lack of good manners" is not a materially adverse action.  *Burlington North*, *supra*, 126 S. Ct. at 2415.  Finally, Mr. Parks failure to report Ms. West's alleged complaint to Human Resources had no effect on her because it is undisputed that

-18-

the alleged harassment by George stopped entirely after Mr. Parks moved her to an outside table. (West Depo., p. 69.)

Further, Ms. West admits that after her alleged complaint to Mr. Parks, there were never any changes made to her job duties, pay or working hours.  (West Depo., p. 117.)  Ms. West also admits that Mr. Parks never treated her in a way that made her believe he was angry that she allegedly complained of sexual harassment.  (*Id.* at pp. 117-18.)  Clearly, Ms. West cannot prove that she suffered a materially adverse action as a result of her alleged complaints.  Accordingly, her claim for retaliation under the Kentucky Civil Rights Act fails as a matter of law.

### III.    Ms. West's constructive discharge claim fails as a matter of law.

Ms. West alleges that she was constructively discharged.  *See* Complaint, ¶10, 18, 24,31, and 36.  To establish that she was constructively discharged, Ms. West is required to prove: (1) Tyson deliberately created intolerable working conditions as perceived by a reasonable person, and (2) Tyson did so with the intention of forcing the employee to quit.  *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) *citing  Moore v. Kuka Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999); *Jones v. Miller Pipeline Corp.*, 2005 U.S. Dist. Lexis 21216, * 9-*12 (W.D. Ky. 2005).

Ms. West cannot establish that that she was constructively discharged.  Ms. West admits that Tyson was not intentionally attempting to force her to quit:

> Q.    Do you believe that Tyson was trying to intentionally get
>        you to quit your job?
>
> A.    No.

(West Depo., p. 118.)  Thus, she cannot show that Tyson was intentionally trying to force her to quit.

Further, by Ms. West's own admission, the incident that was "the straw that broke the

camel's back," was her allegedly being followed to her car on the last night she worked.  (*Id.* at pp. 96-98.)  While it may have been frightening if true, Ms. West has no evidence to support that this alleged incident was sexual in nature as opposed to an attempted robbery, car-jacking or other non-sexual criminal act.  Thus, Ms. West's claim for alleged constructive discharge fails as a matter of law, and must be dismissed.

## **CONCLUSION**

Ms. West's claims fail as a matter of law.  Ms. West's sexual harassment claims fail because the alleged conduct of the first three weeks do not constitute actionable harassment.  Further, Ms. West's remaining allegations of sexual harassment fail because she unreasonably failed to report the alleged conduct.

Ms. West's retaliation claims also fail because she failed to file a Charge of Discrimination for retaliation with the EEOC and, therefore, the Court does not have subject matter jurisdiction over her Title VII retaliation claims.  Also, Ms. West's retaliation claims under the Kentucky Civil Rights Act fail because she cannot show that she suffered an adverse action as a result of her alleged complaints.  Finally, Ms. West cannot prove that Tyson was intentionally trying to force her to resign.  Accordingly, her claim for constructive discharge fails as a matter of law.

Based on the forgoing, Ms. West's claims fail as a matter of law and, therefore, must be dismissed with prejudice.

s/ Demetrius O. Holloway
Shannon Antle Hamilton
Demetrius O. Holloway
STITES & HARBISON, PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
shamilton@stites.com
dholloway@stites.com
Telephone: (502) 587-3400
COUNSEL FOR DEFENDANT, TYSON
FOODS, INC.

CERTIFICATE OF SERVICE

On August 13, 2007, I electronically filed the above pleading through the ECF system, which will send a notice of electronic filing to the following:

W. Keith Ransdell, Esq.
176 Pasadena Drive
Building 1
Lexington, KY  40503
Telephone:  (859) 276-6262
E-mail:  keith@rwlaw.org
Counsel For Plaintiff, Amanda West

Bradley P. Rhoads
Rhoads & Rhoads, P.S.C.
115 E. Second Street, Suite 100,
Owensboro, Kentucky 42303
brad@rhoadsandrhoads.com
Co-Counsel for Plaintiff, Amanda West

s/ Demetrius O. Holloway
Demetrius O. Holloway

606978:3:LOUISVILLE