UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CIVIL ACTION NO. 4:05-CV-183M


AMANDA WEST                                                                PLAINTIFF


V.

   <u>PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT</u>

TYSON FOODS, INC.                                                          DEFENDANT


* * * * * * * *

   Comes Plaintiff Amanda West, by and through counsel, and for her Response to

Defendant's Motion for Summary Judgment, states as follows:

<u>Introduction</u>

   Tyson studiously avoids its obligation to view evidence and draw all reasonable

inferences in favor of West in its Motion.  Instead, Tyson presents the Court with a

version of "facts" containing significant omissions and a presentation slanted in favor of

its own positions, with no consideration of the appropriate standards under which

summary judgment is evaluated.

   Amanda West suffered sexual harassment, including disturbing physical assaults

and batteries of a sexual nature, that were sanctioned under Tyson's leadership.  **Despite**

**complaints to Tyson management, including a Tyson Human Resources manager**

**and others charged with responsibility for those complaints, Tyson took no action to**

**timely investigate West's concerns or provide prompt and remedial action, as**

**required by law**.  West reported the sexual harassment to Supervisor Corey Parks,

followed the direction of Parks to wait while the matter was being "fixed", and was then abandoned by Tyson to continue to suffer brutal sexual assaults and batteries. The help that was guaranteed by Tyson in its sexual harassment policy **and required by law** never arrived. Tyson's management sanctioned the culture of sexual harassment prevalent in its Robards' facility, permitting constant attacks upon Amanda West while openly admitting in the present litigation that it had **no intention to investigate** West's claims, even after West reported all that had occurred directly to Tyson's Human Resources manager. West easily establishes a prima facie case of sexual harassment and that she was constructively discharged from her employment with Tyson.

<u>Statement of Facts</u>

Plaintiff Amanda West (hereinafter "West") was hired at the Robards, Kentucky chicken processing plant of Tyson Foods, Inc. (hereinafter "Tyson") on approximately January 7, 2005. Deposition of Amanda West, pp. 35-36. A copy of West's deposition is attached hereto as Exhibits A-1 (pages 1-64) and A-2 (pages 65-140) collectively. On January 10, 2005, West received a copy of Tyson's sexual harassment policy that firmly established the manner in which Tyson promised it would handle any complaints of sexual harassment from its employees. West depo., p. 33. A copy of Tyson's sexual harassment policy is attached hereto as Exhibit B.

Tyson's sexual harassment policy contains several provisions of significance to West's claims in this action. The policy makes all Team Members "responsible for discouraging harassment" and requires any Team Member that learns of harassment to "report it immediately". Tyson's reporting mechanism also establishes a clear line of communication for its policy to be satisfied by a complaining, harassed Team Member.

> **Contact your supervisor** and/**or** local HR Manager.  The HR Manager will promptly investigate and resolve the complaint as quickly as possible to effect prompt and effective remedial action if harassment is determined to have occurred.  **In no circumstances**, [sic] **shall the investigation take longer than two working weeks**.  In cases where the parties work in close proximity and/or reporting, there should be careful attention to address that working relationship in the interim.  **Once resolved, if the Team Member wants to appeal the resolution, the Team Member can go to step 2.**

Tyson sexual harassment policy, p. 2 (emphasis added).  Tyson's policy is satisfied upon a Team Member reporting to a supervisor or a Human Resources Manager.  Tyson guarantees that, once reported, an investigation will be concluded within two "working weeks".  **Only after resolution of the complaint by a completed investigation does the complaining Team Member have the right to appeal the decision resulting from the completed investigation**.  See Tyson's sexual harassment policy, Steps 2 and 3, p. 2.

I.      Sexual harassment suffered by Amanda West.

A.      Weeks one and two on the processing floor.

After a few days of orientation, West was assigned to second shift and placed on the processing floor of the Tyson plant and assigned to a "de-bone" table.  West depo., pp. 38-40.  West had requested second shift for the expected overtime and so that she and her husband "don't have to struggle the kids back and forth from one place to the other.  That way he can be home with them in the evenings."  Id. at 11-12, 91.  The second shift assignment was also important to West so that she only had to pay for childcare for a couple of hours each day.  Id.

During West's employment at Tyson, the second shift at Tyson was made up of approximately eighty percent Hispanic employees, ten percent black employees and ten percent white employees.  Id. at 73.  West, a Caucasian female, immediately began

experiencing sexual harassment by numerous Hispanic male employees when she began working on the processing floor.  Id. at 48.

> The first week I was just being told that I had a nice ass, that I had big boobs, just that I was sexy like that.

Id. at 40-41.  West testified that,

> they would hoop and holler.  You would walk on the floor and they would just be woo-hoo, and doing the wolf whistle to you and hollering.  I mean it would be a whole table of hollering and carrying on.

Id. at 41.   West also alleges that during that first week on the floor, a couple of the harassers "would be like you got a boyfriend, you know, and I just told them, no, that I was married and leave me alone, not interested."  Id. at 42.  The Hispanics would then get in a group, look at West "and all smile and speak in Spanish and start laughing and pointing at me.  That happened a lot, too."  Id.   West testified that the Hispanics would harass her "every chance they got", including in the hallways, in the cafeteria, in the locker room and while walking on and off of the processing floor.  Id. at 43.  West estimates that the wolf whistles and sexually oriented comments occurred at least 10 to 15 times for each shift that she worked (meaning that West suffered from a minimum of 220 incidents of sexual harassment during her four plus weeks working on the processing floor).  Affidavit of Amanda West attached hereto as Exhibit C.    Even while working at the de-bone table, West alleges that Hispanic employees that would be sweeping the floor would come up behind her and say sexually oriented "stuff" to her.  Id.

> West states that the sexual harassment was open and obvious.

> I mean, they're hollering through the whole plant, how anyone did not hear them is beyond me.  I mean, the whole plant should have known.

Id. at 45.  West spoke to two co-workers, Andrea Boykin and John Fellows, about the harassment in the first two weeks on the floor.  West's experience during the first two weeks were consistently the same, with the Hispanics keeping up the verbal harassment, asking West to go out with them, asking her if she had a boyfriend or a husband and making comments about her breasts and behind.  Id. at 50.

B.      Week three on the processing floor.

During the third week, the Hispanic males on the processing floor continued to make the same types of comments as in the first two weeks, as well as continuing the "wolf whistles".  "[E]verything that happened in the first week continued to go on."  Id. at 64.  However, the sexual harassment took an even more frightening, physical turn for West.

> I was working in the chicken tender line, which was closed in, it was the back line and there was a line lead, which in my opinion those are supervisor-type people.  I mean, he doesn't have the supervisor title but he's in charge of that line.  His name was George, and he kept coming up to me while I was in the chicken tender line and getting right up in my ear saying stuff and he tried to kiss me on my cheek and I turned my head.  And he asked me if I would go home and f-u-c-k him.  And I told him, "No, that I was married and to leave me alone."  And he said that I had a nice ass and stood there a little bit longer.  He finally got the point that I didn't want anything to do with him and he walked off and he grabbed his crotch and he said "Suck my dick".  And he grabbed it and shook it at me.  In his clothes, he didn't take it out, but I mean –

Id. at 55-56.  West testified that she told George that she was married.  "He said he didn't care."  Id. at 58.  **George physically touched West** ("his creek [sic] touched my cheek") when he attempted to press himself upon her.  Id.  Approximately eight other Hispanic men witnessed George's assault and battery upon West, "laughing and smiling and carrying on while the whole thing was going on."  Id. at 61.  West described her

understanding of George's authority in the line lead position as him being "responsible for that line. Kind of like a manager type." Id. at 59.

At that point, West walked off the processing floor "to go speak to someone", finding her Trainer, O'dell Stokes, and Corey Parks, a **Tyson supervisor and formal member of Tyson management**. West told Stokes and Parks what she had experienced during her three weeks at Tyson. Id. at 65.

> I told Corey that -- everything that I just told you that George did and I told him about all the sexual comments that had been going on, people talking to me and things they had been saying and whenever I told him that George did that, he kind of looked at me confused, he said, "My George did that?" and I said, "Yes, he did." And then he said, "**Well, you just have to understand that that's how Hispanics treat their women. That that's their culture**." He said, "**You just have to understand that**." And I proceeded to tell him that they're in America and that they should have to treat us the same way that everyone else does that lives here. And he just kind of laughed and he said – he said, "**Well, you are hot, you know." And then he laughed again**. And I just kind of gave him a look and like, you know, that's not funny. And then he kind of realized that I was serious. . . And then he told me that **he promised he would get to the bottom of it** and he then proceeded to ask me if I wanted to go back to de-bone table, which to me was very offensive because he was wanting to move me instead of him and I told him no. Because the de-bone table is a lot harder than the tender, you know, I felt like that I earned getting to go to the tender line. And - - so he was wanting to move me instead of addressing the problem and I told him, no, that I didn't want to be moved, that just put me to where I was visible.

Id. at 65-66 (emphasis added). During this conversation with Parks, West also identified another Tyson Line lead named Samuel as an employee that had been making sexual comments to West, and that Samuel "was very persistent" in his approaches and comments to West. Id. at 70. West also physically pointed out two or three other Hispanics to Parks that had been participating in the sexual harassment of West. Id. "And he [Parks] looked, seen who they were and he said okay." Id.

Parks was intent on "handling" West's complaint his way.

> Q.	Did he ask you did you want to go to human resources?
> A.	No, he did not.  He told - - **actually he asked me not to**.  He said let me fix this first.
> Q.	So did you mention human resources to him?
> A.	No.  That's where I was headed with Odel Stokes.  Odel Stokes was with me.  He followed me out and I said I'm just going to go talk to somebody and that's when Corey, you know, came over there.  Because **he seen I was crying, I was upset**.

Id. at 71 (emphasis added).  Parks told West that she should not go to human resources, instead instructing West, "**Well, let me fix it first.  I promise you I'll fix it, I'll take care of it**."  Id. at 75.

The Court should note that while Corey Parks and O'dell Stokes have largely downplayed the content of Ms. West's reporting to them in their depositions, and both have denied that Corey Parks acted inappropriately when Ms. West made her complaint directly to him, Tyson Trainer Natasha Brown contradicted their testimony regarding West's reporting to Parks in her deposition:

> Q.	 Okay.  And to your knowledge, she [West] and Junior [Odel Stokes, Jr.] then actually got some help?
> A.	Yeah.
> Q.	 Ok.  Do you know what form of help that was?
> A.	No, I don't.  I know he went to his supervisor.
> Q.	To Corey Parks?
> A.	Yeah.
> Q.	Do you know what happened after that?
> A.	Junior come to me, **and he didn't seem very happy**.  I know he went to Corey.
> Q.	You know that Junior actually spoke directly to Corey?
> A.	That's what he told me.  I didn't see him.  That's what he told me.
> Q.	Did he tell you what he told Corey?
> A.	 He told me that they went and spoke to him about it.  He didn't say, you know….I don't know who the whole thing was about or what the issue was.  I just know she was complaining about something.

> Q.      Just so I'm clear, O'dell Stokes, Jr. told you that he had spoken directly to Corey Parks about Amanda West's concerns about being sexually harassed?
>
> A.      Yeah
>
> . . .
>
> Q.      Did you say that when O'dell came back from talking to Corey he appeared to be mad or upset or something? Did you say that, or am I dreaming that?
>
> A.      **I said he looked kind of frustrated**.
>
> Q.      Do you know why he was frustrated?
>
> A.      He spoke with Corey and he come back and seemed frustrated.
>
> Q.      But he didn't tell you why?
>
> A.       **He told me that the supervisor didn't really – kind of blew it off, I guess**.

Natasha Brown depo., pp 8-9, 17 (emphasis added).  A copy of the cited pages to Brown's deposition are attached as Exhibit D.  Natasha Brown's testimony corroborates West's testimony that Corey Parks responded "inappropriately" to West's complaints, supporting West's contention that Parks told West that "that is how the Mexicans treat their women" and that West was "hot."

When questioned by counsel for Tyson as to whether West had called Tyson's "800" number to report the sexual harassment during her third week on the floor, West explained her clear understanding of Tyson's sexual harassment policy.

> Q. And did you use either the two 800 numbers that you could call?
>
> A. No.  I was going - - if you look up here [Tyson's sexual harassment policy], the guidelines for reporting, if you read here what step one is, **that is what I did**.  I never really had the chance to do step two because it says in here that they will investigate it first and then you can appeal the investigation.
>
> Q. Okay.
>
> A. It says contact your supervisor and/or HR manager, which I did.
>
> Q. Okay.  But you didn't talk to the HR manager?
>
> A. No.
>
> Q. You just talked to Mr. Parks.
>
> A. Because it said and/or which means you could speak to either one **and I chose Corey** [Parks].

Id. at 76.

C. <u>Week four on the processing floor.</u>

After reporting her problems with the male Hispanic employees, including reporting the "very persistent" line lead Samuel by name, West had another troubling encounter with Samuel just a few days later during her fourth week on the Tyson processing floor. <u>Id</u>. at 64.

> **A.** One day I was going down the hall to the bathroom, this was while the shift was going on so the halls were empty. I don't know if he followed me out there or if he just happened to be out there, but he come up behind me, put his arm around me, **he pulled me to him to where my butt was up against, you know, he come up to me from behind.**
>
> Q. Okay.
>
> A. He was from behind me. **He actually had lip contact with my face. He kissed me**.
>
> Q. Okay.
>
> A. And then he was, you know, just saying he thought I was hot and everything. I pushed him back to – you know, get away from me. **And his hand went across my boobs and then as I was walking away he grabbed my butt**.
>
> Q. Okay.
>
> A. **And then he did it again on another date**. **He grabbed my butt again**.
>
> Q. Okay. Now, you say his hands went across your boobs, was this from the pushing or are you saying that he intentionally put his hand - -
>
> A. He **intentionally**. Whenever I pushed him he reached up and just made a, you know.

<u>Id</u>. at 59-60 (emphasis added). During that fourth week, West was also physically, sexually battered in the Tyson locker room by two male Hispanics.

> In the locker room on a different occasion there was two Hispanic men in there – I mean, there was a bunch of people in there. But two Hispanic, one of them kind of nudged me up against the locker and the other one was standing there and they grabbed my butt as well. . . **he literally grabbed hold of it and squeezed it**.

<u>Id</u>. at 62-63 (emphasis added).

West went to Tyson's designated Trainer, Odel Stokes, who had been involved in West's reporting to Parks, and told him her problems at Tyson were continuing.  Id. at 80.

> **I said it's not getting any better, you know**.  That's when I had made the comment that I thought I was just going to quit and **he went and talked to [Supervisor] Maria**.  What he said to Maria I have no idea, you know, so it's not fair for me to say that he told her I was being harassed, but I know that he spoke to Maria because **she made the comment to me that I was a good worker and that she hoped I would stick around**.

Id. at 80 (emphasis added).  During her fourth week on the floor, West continued to tell Trainer Odel Stokes everything that was happening to her.  Id. at 93.  West also informed two co-workers, Andrea Boykin and John Fellows, about the continuing, escalating harassment.  Id. at 87.

D.      Week five on the processing floor.

West continued to experience constant comments of a sexual nature during her fifth week on the processing floor at Tyson.  Id. at 97.  West testified that she reached her breaking point during that fifth week.  Id. at 96.  Just a couple of days into the fifth week, West describes leaving the Tyson plant in the middle of the night, by herself, to go to her car that was parked in Tyson's lot.  Id. at 101.

> . . . I was by myself and I was walking to my car and there was a Hispanic man behind me, kind of **doing the wolf whistle**, type whistle and I turned around  to see who's back there and he had given me, you know, kind of a creepy smile.  Not a friendly smile, you know, **a smile that I was not comfortable with**.  I sped up.  He sped up.  I was, you know, at a very fast pace to get to my car.  **I was praying, please God, please God, don't let me - - you know, I was scared to death**.  And he followed me all the way until I got in my car.  I locked the doors and then he looked at me, **gave me a creepy smile** and then walked clear across the other side of the parking lot.  So his car was nowhere near my car.  He followed me all the way to my vehicle.  And I was scared to death, looked in my rear view mirror all the way home.

Id. at 96-97.  West refused to return to her shift after the incident in the parking lot in conjunction with everything else that had occurred at the Tyson plant.

On the following Friday, however, West returned to the Tyson plant, going to the office to pick up her final paycheck.  Id. at 106-107.  While at the Tyson plant, West met with Human Resources Manager Ralph Guizar for 30-45 minutes.  Id. at 107.  During that meeting, West went over in detail **every incident** of sexual harassment that occurred. Id. at 108.   West described her meeting with Guizar:

> A.   He was very apologetic and acted sincere.  I mean - -
> Q.   Did he indicate that you didn't have to quit, that this could be investigated?
> A.   He never told me I didn't have to quit.  He did tell me he would get to the bottom of it and he would, you know, investigate it after I left.
> Q.   Did he ask you for names of witnesses?
> A.   I told him that I spoke to Andrea, that I talked to Odel Stokes.  I told him about Corey [Parks] and I told him the comment that Corey made to me also.
> Q.   At any point did Mr. Guizar indicate that, you know, we would investigate this and that you didn't have to leave, that it could be investigated?
> A.   He never told me I didn't have to leave.  He told me he would investigate it, but he never told me I didn't have to leave.  He just let me leave.

Id. at 108-109.  West's meeting with Guizar is also the subject of the Motion for Inference that has been filed by West for the Court's consideration.

When counsel for Tyson questioned West about refusing to return to work on the Tyson processing floor, West's response was clear and unequivocal.

> Q.   And before we move away from that exhibit, do you agree that pursuant to the policy form the two times you left and by not calling in on those days that you didn't come to work, that you were terminable under Tyson's attendance policy?
> A.   No, I do not.  I feel like I left because the conditions were so bad that I could not return.  **I feel that they pushed me out of there, not that I left of my own free will**.

<u>Id</u>. at 110 (emphasis added).

II.  <u>Tyson's non-response to West's reporting of sexual harassment</u>.

Prominently absent from Tyson's 21 page Memorandum in Support of Summary Judgment is any reference to the steps Tyson took to investigate and remedy West's reporting of sexual harassment as promised in its sexual harassment policy. The reason for that omission is simple: **Tyson did not take any action to investigate West's concerns during her employment or for months afterward, despite West's reporting to Supervisor Parks, Trainer Stokes and Human Resources Manager Guizar, among others.** Deposition of Stephanie Rackard, pp. 9-10. Tyson designated Stephanie Rackard as its Rule 30(b)(6) corporate representative to testify as to matters relating to Tyson's response to West's complaints. A copy of Ms. Rackard's deposition is attached hereto as Exhibits E-1 (pages 1-50) and E-2 (pages 51-100) collectively. The only inquiry into West's concerns undertaken by Tyson came after April 6, 2005, in response to West's Charge of Discrimination filed with the Equal Employment Opportunity Commission that had been forwarded to Tyson. <u>Id</u>.

Despite Tyson's attempt at criticizing West's reporting in their Memorandum, Tyson's **official position** is that **West satisfied Tyson's policy by reporting the sexual harassment in week three to Supervisor Corey Parks**. <u>Id</u>. at 26. Parks was then required to pass the information along to Human Resources and an investigation was required to begin immediately. <u>Id</u>. Tyson's sexual harassment policy then unequivocally promises that, "[i]n no circumstances shall the investigation take longer than two weeks."

Tyson's policy also requires that if pay "careful attention to address that working relationship in the interim".

West relied upon the promises and training provided by Tyson that her reporting would initiate an immediate investigation into her concerns. "To my knowledge, Corey [Parks] was fixing it because he told me he would." West depo., p.78. West testified that, from week three until she could take no more abuse in week five, she waited for Tyson's promised reaction and remedy.

> That's why I didn't go to a - - go a higher step up again because I - - you know, I thought that Corey was going to do it but yet nothing seemed to happen but in here [Tyson's sexual harassment policy] **it says it could take up to two weeks** so, you know, I didn't know what was going on. He never came up to me and told me that he did or didn't go [to Human Resources]. I figured he would follow-up with me and he didn't.

Id. at 85 (emphasis added). West's desperation in waiting for Tyson to take action is consistent with the admitted training she received from Tyson. Tyson acknowledges that the complaining employee is told during Tyson's sexual harassment training that "**once the investigation is concluded**, that we'll follow up with the complaint, and that due to a confidentiality for other team members, we may not be able to go into detail with respect to any action taken . . . ." Rackard depo., pp. 24-25 (emphasis added). West's reliance upon Tyson's promised action led to continued, escalating sexual harassment, with no intervention by Tyson and ultimately, a hopeless situation for West.

> . . . and so I reported it to Corey because that's what it tells you to do and it says that they will investigate and, you know, it takes more than two weeks. **Well, I was only there two more weeks so.**

West depo., p. 77 (emphasis added).

Corey Parks acknowledges that he did not report West's complaints to Human Resources, or to anyone else for that matter, and that **no investigation was initiated** by

Tyson based on West's reporting to Parks. Parks depo., p.26. Cited pages to Corey Parks' deposition are attached hereto as Exhibit F.

Parks ultimately received written discipline for failing to handle West's complaints properly. A copy of the written warning received by Parks is attached hereto as Exhibit G. Likewise, Trainers Odel Stokes and Natasha Brown were disciplined for their failure to follow Tyson's sexual harassment procedure by not reporting West's complaints to Human Resources. Attached hereto as Exhibit H are the disciplinary notices for Stokes and Brown.

Tyson also acknowledges that, despite West's reporting of all events to Guizar, a Tyson Human Resources Manager, during her exit interview, Tyson took no action to investigate West's complaints then, either. See Tyson's Answer to Interrogatory No. 1 attached hereto as Exhibit I; see also Rackard depo., p. 25. In fact, **Tyson now admits that it had no plan or intent to launch any investigation into West's complaints, even after West's detailed complaint to Guizar, prior to its receipt of West's EEOC Charge of Discrimination on April 6, 2005**. Id.

Curiously, Tyson did not even consider disciplining Human Resources Manager Ralph Guizar, despite his exit interview with West in which even Guizar acknowledges that West complained of being physically touched by Hispanic employees in a sexual manner. Id. at 27-34. Tyson now grudgingly acknowledges that Guizar should also have been issued discipline for failing to follow Tyson's sexual harassment policy by taking no action following West's complaints. Id. at 33-34.

After receipt of West's Charge of Discrimination on April 6, 2005, Tyson finally felt compelled to make an inquiry into West's complaints, with no assistance from West

and having conveniently "lost" Guizar's notes containing West's detailed allegations.

See West's Motion for Inference based on the spoliation of Guizar's exit interview notes by Tyson currently pending before the Court; see also Rackard depo., p. 56. As a result, Tyson based its review on Guizar's memory of the exit interview with West, despite the fact that Guizar admittedly could not even recall whether he interviewed West or what she said. Attached hereto as Exhibit J are a series of emails between Guizar and other members of Tyson management after Tyson received West's Charge of Discrimination, that, on their own, establish the minimal value of Guizar's memory. Guizar wrote:

> Due to the large amount of persons I have seen since I talked to Amanda West, it would be extremely difficult to recollect exactly what was said. As best as I can recall, **and this is after looking at her picture in her file**, is that I did conduct the exit interview. She said something to the effect that she came to Tyson to work and not to be harassed by the Hispanics. I asked her what type of harassment was she talking about and she said sexual. The Hispanics were touching her behind, etc.

See Guizar email dated April 7, 2005 at 12:52 p.m.

Tyson's ultimate conclusion from its inquiry required by the EEOC, based upon Guizar's failed memory and the single paragraph contained in West's Charge of Discrimination, is that West was **untruthful** in her numerous reportings of sexual harassment months earlier, during her employment. Id. at 71. In reaching its conclusions, Tyson chose to believe as true comments from Tyson's employees, months after West's departure, that were attributed to West that West wanted to spend more time with her kids, while wholly rejecting **all of the other comments** that West made to those same employees complaining about the ongoing sexual harassment. Rackard depo., pp. 66-67. West's Motion for Inference requests that West be awarded an inference that Guizar's notes from West's exit interview contain detailed facts and names regarding all

of the sexual harassment suffered by West, information that was available to Tyson during its period of responding to the EEOC, but that was not used by Tyson in its "too-late" inquiry.

<u>Summary Judgment Standard</u>

The familiar Rule 56 standard is clear. Only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law" is summary judgment appropriate. Fed.R.Civ.P. 56(c). The Court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party. <u>See</u> <u>Northland Ins. Co. v. Guardsman Prods.</u>, 141 F.3d 612, 616 (6th Cir. 1998). "To prevail, the nonmovant must show sufficient evidence to create a genuine issue of material fact." <u>Id</u>. (Citing <u>Klepper v. First Am. Bank</u>, 916 F.2d 337, 341-42 (6th Cir. 1990), in turn citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). " 'There must be evidence on which the jury could reasonably find for the [nonmovant].' " <u>Klepper</u>, 916 F2d at 342 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

<u>Argument</u>

I.    <u>West's sexual harassment claim against Tyson easily survives summary judgment.</u>

West asserts that she was sexually harassed by numerous male Hispanic co-workers, by the comments from Corey Parks when West reported the sexual harassment

and by the progressively violent and hostile actions of Line leads George and Samuel and

other unidentified Tyson employees.

> To establish a prima facie case of a hostile work environment based on
> sex, a plaintiff must show that: (1) she is a member of a protected class,
> (2) she was subjected to unwelcome sexual harassment, (3) the harassment
> was based on her sex, (4) the harassment created a hostile work
> environment, and that (5) the employer is vicariously liable.

Clark v. United Parcel Service, Inc. 400 F.3d 341, 347 -348 (6th Cir. 2005). Tyson does

not dispute in its Motion that West easily meets the first three requirements. Therefore,

West addresses the two remaining requirements establishing that she has suffered

actionable sexual harassment.

A. West suffered actionable sexual harassment that was "severe and pervasive".

The Supreme Court has held that "[w]hen the workplace is permeated with

"discriminatory intimidation, ridicule, and insult," that is 'sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive working

environment,' Title VII is violated." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21

(1993) (citations omitted) (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-

67 (1986)). Whether or not a hostile work environment exists is "judged by both an

objective and subjective standard: The conduct must be severe or pervasive enough to

create an environment that a reasonable person would find hostile or abusive, and the

victim must subjectively regard that environment as abusive." Black v. Zaring Homes,

Inc., 104 F. 3d 822, 826 (6th Cir. 1997).

"Rather than considering each event complained of in isolation, **[the court] must

consider the totality of the circumstances** in determining whether the harassment was

sufficiently severe and pervasive." Randolph v. Ohio Dept. of Youth Services, 453 F. 3d

724 (6th Cir. 2006) (emphasis added).  Relevant factors include "the frequency of the discriminatory conduct; its severity, **whether it is physically threatening or humiliating**, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  <u>Harris</u>, 510 U.S. at 23 (emphasis added).

      1.      <u>Rejection of Tyson's arbitrary compartmentalization of West's complaints requires the Court to dismiss Tyson's summary judgment motion as to "severe and pervasive".</u>

The Court should note that, in its Memorandum, **Tyson does not dispute that the harassment suffered by West in weeks four and five on its processing floor satisfies the "severe and pervasive" requirement**. <u>See</u> Tyson's Memorandum, generally. During her final two weeks working on Tyson's processing floor, West was subjected to numerous, sexually oriented assaults and batteries. Tyson now attempts to slyly view the indignities suffered by West as isolated incidents, rather than follow the law in considering them under a "totality of the circumstances" in which West suffered sexual abuse at the hands of Tyson employees that grew progressively worse only **after** West had reported her concerns to Tyson management.   In considering the "totality of the circumstances", including the sexual harassment in weeks four and five, rejection by this Court of Tyson's arbitrary division of West's sexual harassment complaints between the first three weeks and the last two weeks requires that Tyson's Motion fails.

      a.  <u>Tyson failed to take any action, including its promised "immediate investigation" to protect West once she complained to Parks.</u>

Tyson attempts to arbitrarily "group" the sexual harassment suffered by West to manipulate some form of an argument in support of summary judgment. Tyson has admitted that West properly reported sexual harassment to Parks and Guizar that satisfied Tyson's reporting requirements under its own sexual harassment policy. That policy required Tyson to initiate an immediate investigation upon West's initial complaint to Parks and to pay "**careful attention to that working relationship in the interim**". Had Tyson simply acted as it promised West and done what the law required at that point, to "prevent and correct" the harassing conduct, West would have been spared the indignity of the brutal assaults and batteries that she suffered in weeks three, four and five. Clark v. United Parcel Service, Inc., 400 F.3d 341, 350 (6th Cir. 2005). As noted by the U.S. Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775, 805-06, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), "the primary purpose of Title VII is not to provide redress for harassed employees, but to **avoid the harm in the first place**."

Upon reporting to Parks, West was instructed by Parks to **not** go to Human Resources and that Parks would "take care" of the situation. **West satisfied her duty by following Tyson's policy in reporting to Parks and then following the direction of Tyson management**.

When Tyson failed to take any action to protect West upon her initial complaint to Parks, Tyson became responsible for all that followed.

> A supervisor's failure to act when that supervisor has knowledge of the harassment and the authority to prevent it inflicts harm on the victim that is as real as if the supervisor were doing the harassing. The victimized employee in this situation thus suffers two distinct, discriminatory harms: the co-worker's initial harassment; and the supervisor's implicit approval of the harassment, which changes and intensifies the quality of the injury. In addition, a supervisor's inaction in the face of adequate notice of harassment "is facilitated by the existence of the actual agency

relationship" as surely as if the supervisor's action created it. <u>Faragher</u>, 118 S.Ct. at 2290. The agency relation is indispensable to the infliction of the injury because supervisors are in a position to receive and act (or fail to act) on sexual harassment complaints only because of the authority delegated to them as agents.

<u>Coates v. Sundor Brands, Inc.</u>, 164 F.3d 1361, 1368 (11th Cir.1999). In <u>Faragher</u>, the Supreme Court noted that the EEOC's Guidelines on Discrimination Because of Sex hold the employer liable for coworker harassment if it "knew or should have known of the conduct, **unless it can show it took immediate and corrective action**," and cited with approval a leading treatise that asserted that courts "uniformly" apply the EEOC rule, noting that **"[i]t is not a controversial area"**. <u>Faragher</u>, 118 S.Ct. at 2289 (emphasis added).

       b.  <u>Tyson intentionally ignored West's repeated complaints of sexual harassment to her supervisors and Human Resources that were made consistently for three weeks after her report to Parks.</u>

Tyson's sexual harassment policy instructed West to "[c]ontact your supervisor" to report harassment. West made numerous complaints **within a three week period,** beginning with West's report to Parks. In between West's initial report to Corey Parks and her final report to Guizar, West reported the ongoing, escalating harassment to Tyson's designated Trainer over West, Odel Stokes. ". . . **I talked to him all the time**. **I talked to him a lot**." West depo., p. 92. In that interim two week period, while Tyson was presumably performing an exhaustive investigation into the harassment and taking prompt and remedial action to prevent any other harassment, West informed Stokes that the situation was "not getting any better." <u>Id</u>. at 80. West told Stokes that her butt had been grabbed, told Stokes about the sexual mauling by Samuel in which Samuel had grabbed West's breasts and butt, kissed her and pulled her against him. <u>Id</u>. at 82, 86.

West also told Stokes that "this [the harassment] is getting too much and I didn't think I could work here with all this going on."  Id. at 91.

The Court should note that Tyson, through its designated corporate representative, views both Trainers Odell Stokes and Natasha Brown as serving in a supervisory capacity for purposes of who may properly receive a formal complaint of sexual harassment under Step 1 of Tyson's sexual harassment policy.  Tyson disciplined both Stokes and Brown for their failure to protect West and follow Tyson's sexual harassment policy by initiating an investigation, but took no action against West's peers, Boyken and Fellows, with whom West also shared her concerns.

> Q.  Why did Tyson not discipline [Team Members] Boyken and Fellows and actually discipline [Trainers] Stokes and Brown?
> A.  I know that Stokes and Brown are - - I believe they are trainers in a support capacity.  But to answer that, I don't know.
> Q.  Okay.  Being trainers, are they - - are they deemed as being higher up in the rank at Tyson than, say, Boyken and Fellows?
> A.  Yes.
> **Q.  Someone that West would have looked to in some kind of supervisory capacity?**
> A.  **Yes**.
> Q.  Is that your best guess as to why those two were disciplined and Boyken and Fellows were not?
> A.  Yes, I - - yes.

Rackard depo., p. 51; but see Rackard's depo., pp. 87-89 (where, after a break during the deposition and upon direct questioning by Tyson's counsel, Rackard attempts to dispute whether Trainers Stokes and Brown had a supervisory role); but see also Rackard depo., pp. 94-98 (redirect by counsel for West, noting the oddly timed discrepancy of Rackard's opinions, with Rackard still acknowledging that Tyson holds its Trainers out to new hires as someone to go to if the new hires "have issues about how to conduct your job.").

Tyson's argument that West's claim for sexual harassment must be compartmentalized into the first three weeks and the final two weeks of her time on the processing floor is nothing short of ridiculous. Tyson omits from its Memorandum Tyson's legally required obligation to have initiated an active investigation into West's complaints immediately after she reported to Parks in her third week on the processing floor and to protect West in the "interim". Tyson also wholly ignores the fact and timing of West's continuing reports to Stokes and her final report to Guizar, **all of which took place within a period of less than three weeks following the initial report to Parks and Stokes**. Instead, Tyson abandoned West to the harassment, taking no action and **intending to take no action**, despite West's reporting and despite Tyson's promises in its sexual harassment policy of prompt and remedial action and some notification to West of the results of the investigation only at its completion.

Notwithstanding the horrific events of weeks four and five, West's initial reporting to Parks and Stokes alone is actionable. See EEOC v. Harbert-Yeargin, Inc., 266 F.3d 498, 508-509 (6th Cir. 2001) and Williams v. Gen. Motors Corp., 187 F.3d 553, 562-564 (6th Cir. 1999). In Harbert-Yeargin, the Sixth Circuit found that a plaintiff made a prima facie showing of hostile work environment where a male supervisor grabbed a male employee's genitals on two occasions, stalked the employee several times in a day and where the employee's co-workers taunted him for complaining. Likewise, in Williams the Sixth Circuit held that a hostile work environment was shown when, over a four month period, a male supervisor stared at the plaintiff's breasts and said, "[y]ou can rub up against me anytime . . . you would kill me . . . I don't know if I can handle it, but I'd die with a smile on my face," came up behind her, put his arm around her neck and

told her that she "left the dick out of the hand" when she wrote "Hancock Furniture Company" and came up behind her on another occasion while she was bending over told her to back up.

At the time West complained to Corey Parks in her third week of working on Tyson's processing floor, she had been subjected to countless, ongoing sexually motivated cat-calls, wolf whistles and comments about her "big boobs", her "nice ass" and whether she was willing to go on a date (regardless of her marital status), all of which occurred "every chance they got". By West's calculation, this was approximately 10 to 15 times per shift or a minimum of 220 times total in her five weeks on the processing floor. The harassment was so pervasive that it was being permitted in every area of the plant, including the cafeteria, hallways, locker room and processing floor, such that West had no work area that was free of harassment. West describes the conduct of the Hispanic harassers as so aggressive and pervasive that "how anyone did not hear them is beyond me. I mean, the whole plant should have known."

In addition, prior to West's complaint to Parks, West was assaulted and physically battered by Line lead "George", who was so emboldened by Tyson's lax attitude that "**he kept coming up to**" West, "getting right in my ear saying stuff" and **making physical contact with West's face when he tried to kiss her**. Notwithstanding the failed aggressive attempt to kiss West, George asked West if she would "go home and f-u-c-k him". When West said "no" he told West that she had a "nice ass and stood there a little bit longer", clearly in a threatening, contemplative gesture. George's leadership qualities really shone through when, upon one of the rejections by West, he grabbed his crotch, told West, "suck my dick" and then shook his penis at West.

In Clark, the Sixth Circuit recently based its analysis of whether a work environment was severe and pervasive upon whether the incidents of sexual harassment were deemed to be isolated or ongoing. Clark, 400 F.3d at 352. The Sixth Circuit dismissed the claim of one plaintiff in Clark that had alleged only "isolated instances" of misconduct, but overruled the defendant's motion for summary judgment on the "closer case" presented by the co-plaintiff that alleged "more of an ongoing pattern of unwanted conduct". Id.

Certainly, West was subjected to an ongoing pattern of constant cat-calls, wolf whistles and a stream of comments about her breasts and behind, as well as requests about whether she was married or had a boyfriend, and was also subjected to the specific attacks by Line lead George, who "kept coming up" to West, saying things in her ear, attempting to kiss West in a physically aggressive manner, demanding that she "go home and f-u-c-k him", commenting on her "nice ass" and then lingering in her presence, telling West to "suck my dick" and shaking his penis at West. West was subjected to physical harassment, and physically threatening harassment, of which was all reported to Parks and Stokes in week three.

West also specifically complained to Parks about Samuel making sexual comments to West and expressed her concern, well founded in hindsight, that Samuel "was very persistent" with his harassment of her. This conduct, coupled with Tyson's tacit admission that the "ongoing pattern" of harassment suffered by West in weeks four and five was severe and pervasive, satisfies the hostile work environment standard and requires that Tyson's Motion for Summary Judgment fail as a matter of law.

B.  <u>Tyson's Motion for Summary Judgment fails whether West's harassers were co-workers or supervisors.</u>

1.  <u>Tyson is directly liable for the misconduct of its employees because it "knew or should have known" of the charged sexual harassment.</u>

Tyson declares that George and Samuel, along with the other Hispanic males harassing West, were mere co-workers with West and that West's claim must be analyzed as co-worker harassment. <u>See</u> Tyson's Memorandum, p. 13. However, Tyson curiously **makes no legal analysis or argument as to co-worker harassment** in its Memorandum, likely because West must only establish that Tyson "knew of should have known" of the harassment and failed to take action in order to defeat summary judgment.  <u>Id</u>.

> In the case of a harassing co-worker, "[a]n employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.

<u>Clark</u>, 400 F.3d at 348.

It is undisputed that West's reporting to Parks/Stokes of sexual harassment was badly mishandled, with no investigation as required and promised to West in Tyson's sexual harassment policy, and with Parks himself joining in the harassment by (1) condoning the harassment as a cultural phenomenon among Hispanic males and (2) making harassing comments himself to West directly.  Parks then instructed West that she should not go to Human Resources, promising that he would "fix it".  Instead of an immediate investigation that "[i]n no circumstances" would take longer than two weeks according to Tyson's policy, West was abandoned by Tyson to fend for herself while she waited for Tyson to complete a "confidential" investigation that Tyson was not performing.  West had no idea that Parks had not performed his duties under Tyson's sexual harassment policy

> That's why I didn't go to a  - - go a higher step up again because I - - you know, I thought that Corey [Parks] was going to do it but yet nothing seemed to happen but in here [Tyson's policy] it says it could take up to two weeks so, you know, I didn't know what was going on.  He never came up to me and told me that he did or didn't go.  I figured he would follow-up with me and he didn't.

West depo., p. 85; see also id. at 101.  **Parks instructed West not to go to Human Resources, promising action, and West waited in reliance on Park's direction**. Now Tyson attempts to cast blame on West for acting consistent with Tyson's policy in reporting to Parks and following his directive.

West's continuous reporting to Trainer Stokes and final reporting to Guizar, in addition to reporting to Parks, defeats any effort by Tyson to suggest Tyson did not know or have reason to know of the sexual harassment.  West specifically reported to Stokes everything that was happening to her, at one point desperately telling Stokes that she was going to have to quit her job because "it's not getting any better".  In fact, the brutal assaults and batteries of which she informed both Stokes and Guizar grew more violent as time progressed.

Tyson disciplined Trainers Stokes and Brown for receiving reports of sexual harassment from West due to the **higher rank that they held** relative to West's co-workers, who received the same complaints but were not disciplined.  Tyson's corporate representative, Stephanie Rackard, acknowledges that West should have appropriately looked to Stokes and Brown as if they were in a **supervisory capacity** to West for purposes of reporting. **Rackard's own testimony, acknowledging Stokes' supervisory capacity to West under Tyson's sexual harassment policy, makes clear that West acted reasonably in reporting the sexual harassment to Stokes.**     See Clark, 400 F.3d at 350 (when an employer designates certain employees as implementors of its sexual

harassment policy and when those employees become aware of misconduct, the employer is deemed to have notice of the harassment.). Rackard's opinion, not just as Tyson's corporate representative, matters. Rackard is an EEO specialist for Tyson, whose primary job is to enforce Tyson's sexual harassment policy.

West also reported all of the sexual harassment that she had endured to Guizar in her final act of employment before she could receive her final paycheck, again with no action by Tyson. Contrary to Tyson's "other side of the mouth" argument that West unreasonably failed to report the harassment that occurred in weeks four and five, West timely reported all of that conduct to Trainer Stokes and then to Guizar in Human Resources, with no results or action by Tyson. Tyson had no interest in West's reporting, or the prevention of sexual harassment in general, and **admittedly intended to do nothing even after West's final reporting to Guizar**.

Tyson does not dispute that West reported sexual harassment to Parks, Stokes and Guizar. Therefore, Tyson knew of the sexual harassment and took no action to investigate and remedy as required by law. For these reasons alone, Tyson's Motion for Summary Judgment must be overruled.

2. <u>With George and Samuel as West's supervisors, Tyson is not entitled to an affirmative defense, as a matter of law, where it failed to perform any investigation or take prompt and remedial action based upon West's reporting.</u>

Surprisingly, Tyson comes before the Court claiming entitlement to the <u>Ellereth/Faragher</u> affirmative defense that requires it to have "exercised reasonable care to prevent and correct promptly any sexually harassing behavior". <u>See</u> Tyson Memorandum, p. 12; <u>see</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S.775, 118 S.Ct. 2275 (1998). Tyson makes this argument in an effort to avoid being held strictly liable for the

harassment suffered by West.  <u>See</u> <u>Burlington Industries, Inc. v. Ellereth</u>, 524 U.S. 742, 760-765, 118 S.Ct. 2257 (1998)(if the harasser is a supervisor, the employer is strictly liable for the harassment).

West indeed looked to the Line leads promoted and held out by Tyson as individuals above her in rank, who were given Tyson's authority to supervise her.  For example, West noted that line leads at Tyson were "supervisor type" who were in charge of running certain production lines at Tyson and that Line lead George was "responsible for that line.  Kind of like a manager type."  West depo., pp. 55-56, 59.  Tyson holds its Trainers and Line leads out to its employees as individuals authorized to speak and act and direct work assignments for Tyson to employees like West.

The EEOC's guidelines defines a "supervisor" for purposes of Title VII as a person who, without regard to job title,

> has authority to undertake or recommend tangible employment decisions affecting  the employee; **or** . . . **has authority to direct the employee's daily work activities**.

<u>See</u> EEOC's "Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, Part III(A).  <u>In Mack v. Otis Elevator Co</u>., 326 F.3d 116, 127 (2nd Cir. 2003), the Second Circuit rejected the notion that a supervisor under Title VII must have the authority to hire or fire, instead recognizing that, under <u>Faragher</u>, the exercise of authority granted by the employer is sufficient for a finding that an employer is a supervisor.

> The question in such cases is not whether the employer gave the employee the authority to make economic decisions concerning his or her subordinates.  It is, instead, whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates.  We therefore conclude that the authority that renders a person a supervisor for

purposes of Title VII analysis is broader than that reflected in the <u>Parkins</u> test.

<u>Mack</u>, 326 F.3d at 127; <u>see</u> <u>also</u> <u>Doe v. Oberweis Dairy</u>, 456 F.3d 704, 716-718 (7th Cir. 2006)(Judge Posner notes that under <u>Ellereth</u> and <u>Faragher</u>, an employer has a higher duty of care to protect its employees against those employees whom the employer has armed with authority, even if it is less authority than that which triggers strict liability).

Significantly, Tyson's reliance upon the "face" of its sexual harassment policy alone means that there is no affirmative defense available.

> While the affirmative duty on the part of the employer will often include the requirement that it have some sort of sexual harassment policy in place, **the duty does not end there**. Prong one of the affirmative defense requires an inquiry that looks behind the face of a policy **to determine whether the policy was effective in practice in reasonably preventing and correcting any harassing behavior**. <u>See</u> <u>Faragher</u>, 524 U.S. at 806, 118 S.Ct. 2275 (stating that an employer may satisfy its burden if it has a "proven, effective mechanism for reporting and **resolving harassment**"); <u>Barna</u>, 172 F.3d 47 (finding that the inquiry under prong one is whether, upon having some notification of alleged harassment, **the employer adequately investigated and responded to the situation**). Thus, in determining whether UPS took reasonable care in preventing and promptly correcting the alleged sexual harassment in this case, we must look not only to UPS's sexual harassment policy, as the district court did, but also to its implementation of that policy.

<u>Clark v. United Parcel Service, Inc.</u>, 400 F.3d 341, 349 (6th Cir. 2005) (emphasis added).

Tyson's dedicates much of its brief to an affirmative defense that is impossible to achieve under the facts of this case, as it took no action under its own sexual harassment policy to timely investigate, prevent and correct the harassment suffered by West. In <u>Clark</u>, the Sixth Circuit determined that UPS, like Tyson in this case, placed a duty on all of its supervisors to report sexual harassment to the appropriate management personnel. <u>Id</u>. at 350. After viewing evidence presented by the plaintiff that numerous supervisors witnessed sexual harassment, the Sixth Circuit declared that UPS could not benefit from

the affirmative defense at the summary judgment stage because it failed to show that there is no genuine issue of material fact regarding whether it exercised reasonable care in preventing and correcting harassment under prong one of the defense. Id. at 351.

In West's case, it is undisputed that Tyson took **no action** under its sexual harassment policy to prevent or correct harassment, despite West's reporting, and despite direct involvement in the harassment by Parks, a formal member of Tyson management, and Line leads George and Samuel. **There is not even a jury question available to Tyson on the issue, much less an entitlement to summary judgment**. The discipline of Parks, Stokes and Brown by Tyson, all recognized by Tyson as being responsible under its policy to take action and having failed in their duty to West, in addition to Tyson's undisputed failure to investigate or correct, precludes any affirmative defense as a matter of law.

The Court should also note that Tyson's reliance upon Pennsylvania State Police v. Suders, 124 S.Ct. 2342, 2351 (2004), which permits a defendant to assert the same Faragher affirmative defense in a supervisor-generated hostile environment/constructive discharge case in the absence of an "official act", fails for the exact same reason. It is undisputed that Tyson performed no investigation and took no action to prevent the harm being suffered by West once she reported to Parks and others, making the attempted assertion of the affirmative defense by Tyson an exercise in futility. The Court should also note, however, that Park's decision to instruct West not to report harassment to Human Resources directly after reporting to Parks does represent an "official act" by Tyson management under Suders that effectively altered the application of Tyson's sexual harassment policy as it related to West. Under Suders, such an official act which

resulted in West suffering additional sexual harassment while waiting for the promised action by Tyson presents a genuine issue of fact concerning West's hostile work environment and constructive discharge claim.  Suders, 124 S.Ct. at 2357 (noting that while acts of sexual harassment by her supervisors were unofficial conduct, Suders' allegation surrounding her superiors' failure to forward her computer skills exam for proper evaluation "were less obviously unofficial", resulting in a denial of the defendant's motion for summary judgment by the Supreme Court.)  Parks' affirmative official act, and that of Tyson in general in refusing to implement its own sexual harassment policy, means that to the extent that George, Samuel and Parks were West's supervisors, Tyson is automatically liable for West's injuries.

II.  **West was constructively discharged as a result of Tyson's permissive attitude toward a sexually and physically hostile environment.**

Tyson attacks West's claim of constructive discharge on only two fronts: (1) whether West subjectively believes that Tyson tried to intentionally get West to quit and (2) whether the final event that prevented West from returning was sexually motivated. Tyson fails on both arguments, again refusing to acknowledge the facts and to make inferences in the light most favorable to West.

Tyson attempts to avoid the obvious damages flowing from its constructive discharge of West by mischaracterizing West's deposition testimony through omission and slight of hand. Tyson  argues:

> Ms. West cannot establish that that [sic] she was constructively discharged.  Ms. West admits that Tyson was not intentionally attempting to force her to quit:
> Q.     Do you believe that Tyson was trying to intentionally get you to quit your job?
> A.     No.

(West Depo., p. 118.)  Thus, she cannot show that Tyson was intentionally trying to force her to quit.

Tyson Memorandum, p. 19.

Tyson's desperation is apparent upon its aggressive mischaracterization of West's deposition testimony evident in this argument.  Tyson omits the context in which the above cited testimony was given.  During this portion of West's deposition, Tyson's counsel was questioning West about the day that West reported the sexual harassment to Parks during her third week on the processing floor and West was answering **according to her perspective on that day in dealing with Parks**.  See West depo., pp. 115-118. As the Court can see, during these few pages of her deposition, counsel for Tyson was questioning West about her interaction with Parks about the day of her complaint to Parks and Park's inappropriate reaction to West.  In her answers on those deposition pages, West continually refers to her perspective in dealing with Parks **on the day when she reported the harassment to Parks**.  See discussion at page 116 of West's deposition, e.g. "I told him I didn't want to go back to the de-bone table."  Id. at 116.  As the questioning progressed, it is apparent that West continues to answer from the same perspective of her feelings on the day she reported to Parks.

> A. After suggesting that I go back to the de-bone table and I told him that that's what I wanted to do, then he proceeded to put me where I said I wanted to go.
> Q. At any other point in time did he [Parks] ever do anything else you felt was retaliation?
> A. **Not reporting it to HR for me and correcting the problem** [immediate investigation is required under Tyson's policy].
> Q. Okay.  So you felt like his alleged failure to report was retaliation?
> A. Yes.
> Q. Now, as you testified earlier, you weren't aware that he had not reported this until after you had already left Tyson and the EEOC proceeding had began, correct?
> A. Correct.

Q.  So at the time you were working there, you didn't feel that he [Parks] was retaliating against you on that grounds, did you?

**A.  Not that day, but looking back at it I see that he was.**

Q.  Okay.  Did you ever have a change in your job duties?

A.  No. Other than just from the de-bone table to the tender table, that was all.

Q.  You wanted to work on the chicken tenders; is that correct?

A.  That's correct.

Q.  Okay.  After your conversation with Mr. - - your alleged conversation with Mr. Parks, were there any other changes in your duties **after that conversation**?

A.  No.

Q.  Were your working hours changed?

A.  No.

Q.  Was your pay ever changed?

A.  No.

Q.  Did Mr. Parks ever treat you in a way that he was angry with you because you had allegedly complained of sexual harassment?

A.  Not angry, **but him saying that I was hot and laughing about it [on the day of West's complaint to Parks] showed me he thought it was a joke**.

Q.  Do you believe that Tyson was trying to intentionally get you to quit from your job?

A.  No.

West depo., pp. 116-118; <u>see also</u> West's Affidavit attached hereto as Exhibit C, confirming that this response was given relative to Park's response to her complaint on the day West made the complaint.  Tyson's concerning tactic of presenting a short quote, completely out of context, to argue in favor of an ultimate issue on summary judgment, is clearly an effort to mislead the Court, given West's other testimony that day.  Just moments earlier in her deposition, West actually testified about her reaction and subjective feeling over Tyson's "constructive termination", which Tyson completely omits from its argument.

Q.  And before we move away from that exhibit, do you agree that pursuant to the policy form the two times you left and by not calling in on those days that you didn't come to work, that you were terminable under Tyson's attendance policy?

> A. No, I do not. **I feel like I left because the conditions were so bad that I could not return. I feel that they pushed me out of there, not that I left of my own free will**.

Id. at 110 (emphasis added). Fortuitously, Tyson was given an opportunity to prevent West's departure from Tyson when West met with Guizar and told him that she had to leave due to the sexual harassment. Of course, Tyson failed West on that day as well, doing nothing to correct the harassment or prevent West's departure.

> Q. At any point did Mr. Guizar indicate that, you know, we would investigate this and that you didn't have to leave, that it could be investigated?
> A. **He never told me I didn't have to leave**. He told me he would investigate it, but he never told me I didn't have to leave. **He just let me leave.**

Id. at 109 (emphasis added). Tyson's exposed attempt at misdirection, coupled with West's actual testimony of her subjective feelings regarding leaving employment at Tyson, defeats Tyson's argument as to West's subjective feeling under the summary judgment standard and requires that Tyson's Motion be overruled.

Tyson also weakly argues that West being followed to her car on the final night that she worked could have been "an attempted robbery, car-jacking or other non-sexual criminal act." Tyson Memorandum, p. 20. Despite Tyson's wildly speculative allegation, West was not robbed, nor was her car stolen that night. What did occur was that Tyson permitted a Hispanic male at the Tyson plant to harass West in a threatening, sexual manner. The Hispanic male **wolf whistled** at West, smiled at her in a manner that suggested significantly less than romance and followed West in a threatening manner to her car, matching her pace as she fled.[1] For five weeks, West had been, with Tyson's

---

[1] The American Heritage Dictionary defines "wolf whistle" as a "typically two-note whistle made as an often **unsolicited expression of sexual attention**." The American Heritage Dictionary of the English Language, Fourth Edition. Houghton Mifflin Company, 2004. Tyson either did not understand the term or its connotation given by West in her testimony, or simply again ignores the actual evidence in the record.

permission, subjected to constant wolf whistles, sexual comments and at least four instances of physical, sexual battery. Tyson's argument suggests that nothing short of West suffering a fifth instance of sexual battery in lieu of fleeing from her place of employment will satisfy its own "lofty" standards in dealing with sexual harassment.

West certainly perceived that Tyson deliberately created intolerable working conditions for her. Parks, a member of Tyson management, instructed West not to go to Human Resources, and then took no action to investigate what was happening, took no disciplinary action against those harassing West, and did nothing that could effectively prevent any future harassment by the "very persistent" Samuel or the other Hispanic males identified by West. West also offers plenty of evidence that Tyson so acted with the intention of forcing West to quit. Even when West complained to Guizar and told him why she was leaving, Guizar never suggested to West that she should not leave. Instead, West testified that he "just let me leave." West describes her discussion with Guizar:

> **A. The comment that I made was that I wanted to get out of here because of the way that I had been treated and that, yes, my husband didn't want me around that kind of behavior and activity**.
> Q. Did you tell him [Guizar] that your husband didn't want you to work there anymore?
> A. Yes. **Due to the way I was being treated, yes**. He wanted me to go to work everyday and come home happy at night with a paycheck at the end of the week. **Not come home crying and upset**.

West depo., p. 109 (emphasis added). Tyson's admission that it never intended to take any action to investigate West's complaint to Guizar, at the point that she was telling Tyson that she had no choice but to leave due to the harassment, is indisputable evidence of Tyson's intent as to West. Tyson deliberately created and permitted intolerable working conditions, as would be perceived by a reasonable person, with the clear

understanding and intention that West would not continue her employment.  See  Logan v. Denny's, Inc., 259 F.3d 558, 568-569 (6th Cir. 2001).

## Conclusion

For the foregoing reasons, Amanda West respectfully requests that the Court overrule Tyson's Motion for Summary Judgment.[2]

Respectfully submitted,

W. Keith Ransdell
Ransdell & Roach, PLLC
176 Pasadena Drive, Bldg.1
Lexington, KY 40503
Phone: (859) 276-6262

and

Bradley P. Rhoads
Rhoads & Rhoads, PSC
115 E. 2nd Street
P.O. Box 2023
Owensboro, KY 42302-2023

## Certificate of Service

I hereby certify that on September 6, 2007, I electronically filed the foregoing Response with the clerk of the court using the CM/ECF system, which will send a notice of electronic filing to the following:

Demetrius O. Holloway, Esq.
Shannon Antle Hamilton
Stites & Harbison, PLLC
400 West Market Street
Suite 1800
Louisville, Kentucky, 40202-3400

---

[2] West initially filed  retaliation counts against Tyson as well as her sexual harassment claim.  Through the progression of discovery, it has become apparent that the facts in this case center around sexual harassment. West therefore waives her claims for retaliation under the Federal Civil Rights Act and Kentucky Civil Rights Act in the interest of judicial economy.