UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

AMANDA WEST,

    PLAINTIFF

v.                                         CIVIL ACTION NO. 4:05-CV-183M

TYSON FOODS, INC.,                ELECTRONICALLY FILED

    DEFENDANT.

**DEFENDANT'S MEMORANDUM IN RESPONSE TO PLAINTIFF'S MOTION FOR AN ADVERSE INFERENCE BASED ON ALLEGED SPOLIATION OF EVIDENCE**

The defendant, Tyson Foods, Inc. ("Tyson"), by counsel, submits the following memorandum in response to the plaintiff's motion for an adverse inference based on Tyson's alleged spoliation of evidence.

### INTRODUCTION

This is a case of alleged sexual harassment. The plaintiff, Amanda West, seeks an adverse inference at both the summary judgment stage and in the jury instructions based on the loss of the notes of her exit interview. As discussed in detail below, Ms. West cannot establish that Tyson's intentionally, or in bad faith, lost the exit interview notes. Further, it is clear that the exit interview notes would not prove or support any essential element of her claim. Accordingly, Ms. West's motion should be denied.

### COUNTER-STATEMENT OF FACTS

**I.    Tyson and its policies.**

Tyson has a Harassment/Discrimination Policy that it distributes to each of its employees at the beginning of their employment. *See* Exhibit A. Pursuant to its policy, employees who believe harassment and/or discrimination has taken place are required to immediately report the

facts of the incident and the individuals involved. *Id.* Employees are instructed to report the conduct to their supervisor and/or local HR Manager. *Id.* In addition, the policy provides that an employee "at any point can contact Tell Tyson First Line at (800) 643-3410 x-7313 and/or report to <u>any</u> of the following individuals if the Team Member feels more comfortable skipping one or more of the steps." *Id.* (emphasis in original). The policy lists nine different company officials who may be contacted, and provides the employee with the telephone numbers for the Employment Compliance Department and the Tell Tyson First Line for reporting harassment and/or discrimination. *Id.* Further, the policy identifies the name and telephone numbers for the Shift HR Manager, Plant HR Manager, Assistant Complex HR Manager, Complex HR Manager, Director of HR Operations, and the EEO Specialist, who are identified as harassment investigators who may also be contacted to report harassment and/or discrimination. *Id.*

**II.     Ms. West's employment with Tyson.**

    **A.     Ms. West's hiring and orientation.**

On or about January 7, 2005, Ms. West filled out an application for employment with Tyson at the local unemployment office. (West Depo., pp. 14 – 16; Excerpts of Ms. West's deposition testimony are attached hereto at Exhibit B.) After submitting her application, Ms. West went to Tyson's plant where she was interviewed in a group by Ralph Guizar, the Employment Manager for Tyson. (West Depo., p. 16.) After conducting the interview, Mr. Guizar asked each individual which department they would like to be placed, and which shift they would like to work. Ms. West wanted to work in the Debone Department on second shift. (*Id.* at pp. 16-17.) Ms. West was hired on a ninety day probationary period, and worked from approximately 1:00 p.m. to 11:00 p.m. (*Id.* at pp. 17-18.)

Ms. West testified that during orientation, Tyson conducted training on workplace harassment and discrimination. (*Id.* at p. 29.) This training lasted for approximately four hours.

-2-

(*Id*. at p. 32.) Ms. West received Tyson's Harassment/Discrimination policy, and admits that she read the policy, and understood the policy when she read and signed it. (*Id*. at p. 33.) This portion of the orientation took place on January 10, 2005. (*Id*. at pp. 34-35.) Ms. West also testified that during the training on sexual harassment, "they said that anyone that observed anyone being sexually harassed, you were to report it to HR . . .." (*Id*. at p. 30.)

**B.     Ms. West's first week of employment on the floor.**

After her first week of orientation, Ms. West began working on the floor in the Debone Department. (West Depo., p. 36.) (*Id*. at p. 19.) Ms. West's supervisors in the Debone Department were Corey Parks and Maria Robinson. (*Id*. at p. 18.) Upon beginning to work in the plant, Ms. West was trained by Odle "Junior" Stokes and Natasha Brown. Ms. Brown and Mr. Stokes were trainers, and assisted employees with how to perform the actual task of deboning or pulling the chicken tenders. (Stokes Depo., pp. 3, 6; Excerpts of Mr. Stokes' deposition testimony are attached hereto as Exhibit C.)

Beginning around the week of January 17, 2005, Ms. West began working on the floor in the Debone Department. (West Depo., p. 40.) Ms. West alleges that various Hispanic employees would make comments such as she had a "nice ass," she had "big boobs" and that she was "sexy," and would "whoop and holler," and "wolf whistle." (*Id*. at pp. 40–41.) Ms. West did not know the names of any of the individuals who were making the alleged comments. Ms. West testified that during this first week, she mentioned the alleged conduct to her co-workers Andrea Boykin and John Fellows. (*Id*. at p. 47.) However, Ms. West admits that she did not report any of the alleged incidents to the Human Resources Department at Tyson, nor did she inform any of her supervisors during that first week. (*Id*. at p. 49.) In fact, Ms. West testified "I was just thinking, you know, they're just trying to go out with me. I'm a new girl. I didn't really

-3-

take it that seriously the first week." (*Id*. at p. 48.)

### C. Ms. West's second week of employment on the floor.

Ms. West alleges that the same conduct that occurred during the first week continued during the second week she worked on the floor. (West Depo., p. 50.) She alleges that Hispanic employees continued to make comments about her breasts and buttocks, told her she was sexy, asked her to go out with them, and asked whether she had a husband or boyfriend. (*Id*.) Ms. West admits that none of the employees specifically asked her to have sex.

> Q. . . . [D]id any of them specifically ask you for sex or any type of sexual favors or anything of that nature during the first week?
>
> A. Not the first two weeks, no, sir.

(*Id.* at p. 51.) Further, Ms. West admits that none of these individuals physically touched her during the first two weeks. (*Id*. at p. 52.) Ms. West testified that she discussed the alleged conduct with Ms. Boykin and Mr. Fellows, but admitted that she never reported the alleged misconduct to her supervisor, the Human Resources Department at Tyson, or any of the individuals listed on the notification roster of the sexual harassment policy during these first two weeks. (*Id*. at pp. 52-53.)

### D. Ms. West's third week of employment on the floor.

Ms. West alleges that the comments and wolf whistles by the Hispanic employees continued during her third week working on the floor. (West Depo., p. 64.) She also alleges that during this week she was working on the chicken tenders line when a Hispanic employee named George tried to kiss her on the cheek, asked her to have sex, and made a sexually inappropriate comment to her. (*Id.* at pp. 55-56.)

Ms. West alleges that after the alleged incident with George occurred, she was walking

-4-

off the floor to go to Human Resources, and Mr. Stokes approached her and asked her what was wrong. (West Depo., p. 71.) Ms. West alleges that she told Mr. Parks and Mr. Stokes about George's alleged conduct, and the alleged sexual comments that other employees had been making since she started working on the floor. (*Id.* at p. 65.) Ms. West alleges that Mr. Stokes asked her if she wanted to go to Human Resources, and Mr. Parks allegedly said, "Well, let me fix this first." (*Id* at 72-73.)

Ms. West admits that she told Mr. Parks she did not want to work the de-bone table, and he left her on the tenders line, but moved her to an outside line where she would be out in the open. (*Id*.) Ms. West further admits that George did not bother her again during her employment with Tyson. (*Id*.) Ms. West never complained to Mr. Parks about any other alleged sexual harassment. (*Id.* at p. 90.)

Ms. West further alleges that during this alleged conversation with Mr. Parks and Mr. Stokes she complained that an employee named Samwell had also been making comments to her, and also allegedly pointed out a couple of employees whom she alleged had made comments to her on that same morning. (*Id*. at pp. 69-70.) Ms. West alleges that Mr. Parks told her that he would get to the bottom of the situation and that he would fix it, but claims that she never heard a word from him again. (*Id*. at p. 71.)

Mr. Parks' and Mr. Stokes' account differ significantly from Ms. West's recollection. Mr. Parks testified that he approached Ms. West and asked her if she would work overtime checking tenders on the Debone line. (Parks Depo., p. 9; Excerpts of Mr. Parks' deposition testimony are attached hereto as Exhibit D.) Mr. Parks does not believe that Mr. Stokes was present when he approached Ms. West. (*Id.*) Ms. West indicated that she would rather not work overtime. (*Id.* at p. 11.) Mr. Parks began to walk away, and Ms. West stopped him and told him

-5-

that she would do it if he did not put her on an inside line. (*Id.* at pp. 11-12.) Ms. West then stated that when she works on the inside line all the Hispanic guys "whoop and holler" at her. (*Id.* at p. 12.) Mr. Parks asked her if she wanted to go to Human Resources, but she declined and said she did not want to file a complaint. (*Id.* at p. 12.) Ms. West said it was "not a big deal." (*Id.* at p. 16.) Mr. Parks also asked Ms. West to identify the individuals, and she declined and said she did not want to pursue it. (*Id.* at pp. 22-23.) Mr. Parks placed Ms. West on an outside line where he could periodically observe her over the next few days. (*Id.* at p. 23.) Ms. West never expressed any additional concerns to Mr. Parks. (*Id.* at p. 12.)

Mr. Stokes testified that he remembers that Ms. West approached him a couple of times, and told him that someone in the Debone Department was whistling at her, and asked her to go home with him. (Stokes Depo., p. 9.) Mr. Stokes testified that he told her to talk to a supervisor about it, and if it did not get any better to go to Human Resources. (*Id.* at p. 11.) Mr. Stokes testified that Ms. West told him that she had reported the incident to Mr. Parks, but does not recall being present when she spoke with Mr. Parks. (*Id.* at pp. 11-12.)

### E. Ms. West's fourth week of employment on the floor.

Ms. West alleges that during the fourth week of her employment, she was walking to the bathroom when Samwell came up from behind her, put his arm around her so that her buttocks was up against him and kissed her on the face. (West Depo., pp. 59-60.) Ms. West alleges that she pushed him away from her, and he touched her breasts and grabbed her buttocks as she was walking away. (*Id.*) She alleges that Samwell grabbed her buttocks on another occasion during that same week. (*Id.*) Ms. West admits that no one witnessed this alleged incident. (*Id.* at p. 60.)

Ms. West also alleges that during this week she was in the locker room, and a Hispanic

-6-
630246:2:LOUISVILLE

man nudged her against the locker, and he and a second Hispanic man grabbed her buttocks. (West Depo., p. 62.) Ms. West admits that she does not know if anyone saw this alleged incident. (*Id.* at p. 64.) Ms. West never reported either of these alleged incidents to Mr. Parks, the Human Resources Department, or anyone else identified in Tyson's Harassment/Discrimination policy during her employment. (*Id*. at pp. 86-87.) Further, she never used either of the two telephone numbers provided by Tyson to report these incidents. (*Id.*)

Ms. West alleges that she did not report the alleged incidents during her fourth week on the floor because she was waiting to hear back from Mr. Parks regarding the prior report she allegedly made during the third week of her employment. (West Depo., pp. 76-77, 101.) Ms. West alleges that after the alleged incidents of the fourth week, she told Mr. Stokes that things were not getting any better, but she did not specifically tell him about Samwell's alleged actions. (*Id. at* p. 80.) Ms. West testified that she told Mr. Fellows, her co-worker, about the alleged incidents involving Samwell. (*Id*. at pp. 81-82.)[1] Ms. West also alleges that she told Ms. Boykin about someone grabbing her buttocks, but admits that she did not tell Ms. Boykin about the alleged incidents involving Samwell. (*Id*. at p. 82.) In fact, Ms. West admits that she did not tell anyone at Tyson other than her co-workers, John Fellows and Andrea Boykin, about the incident where the two Hispanic men allegedly grabbed her buttocks in the locker room. (*Id*. at pp. 86-87.)

Ms. West testified that she did not go to Human Resources after her alleged complaint to Mr. Parks because the policy indicated that it could take up to two weeks to conduct an investigation, and everything occurred within that two week time frame. (West Depo., p. 77.) Ms. West admits that she knew that pursuant to Tyson's policy she could report the alleged

---

[1] Mr. Fellows testified that Ms. West told him that Samwell had said something to her, but never told him that Samwell actually grabbed her breast or buttocks. (Fellows Depo., pp. 7, 12; Excerpts of Mr. Fellows deposition testimony are attached hereto as Exhibit E.)

-7-
630246:2:LOUISVILLE

incidents to someone else if she was not satisfied, but says that she believed Mr. Parks was fixing the situation. (*Id.* at pp. 77-78.) Ms. West also admits that Ms. Boykin recommend that she go to her husband, Stephen Boykin, who worked in Tyson's Human Resources Department, but Ms. West again indicated that she did not feel comfortable doing so because she did not feel comfortable with people she did not know. (*Id.* at p. 88.) In fact, Ms. West admits that because she did not know any of the people in Human Resources, she would not have reported the alleged misconduct to any of them! (*Id.* at p. 89.)

**F.      Ms. West's final week of employment.**

Ms. West's last week actually working at Tyson was the week of February 7, 2005. *See* Exhibit F. On February 9, 2005, Ms. West attended additional sexual harassment training at Tyson. (*See* Exhibit G; West Depo., pp. 99-100.) Ms. West admits that during this training employees were told that they could report to Human Resources if they did not feel they were getting results after complaining to their supervisor. (*Id.* at p. 101.) Ms. West further admits that at no point during or after this additional training did she tell anyone there that she felt she was being sexually harassed. (*Id.* at p. 100.)

Ms. West's last day actually working for Tyson was on February 10, 2005. *See* Exhibit F. Ms. West alleges that at approximately 2:00 a.m. she was walking to her car, and a Hispanic man walking behind her made a wolf whistle and then followed her to her car. (West Depo., p. 96.*)* When she got into her car and locked the doors, the man smiled and walked away. (*Id.*)

Ms. West admits that she did not recognize the man, and also admits that this was the only alleged incident that occurred during her final week of employment. (West Depo., pp. 98-99.) Ms. West alleges that this alleged incident was "the straw that broke the camel's back." (*Id.* at p. 96.) With the exception of picking up her paycheck on February 18, 2005, Ms. West never

-8-

came back to work at Tyson after this alleged incident. (*Id.* at pp. 97, 99.) Ms. West admits that she never called Tyson to inform the company that she had quit, and simply never came back to work. (*Id.* at p. 111.) Ms. West further admits that she did not report the alleged final incident that occurred on her last day of employment to anyone listed in the Harassment/Disciplinary policy, or call either of the telephone numbers provided by Tyson to report harassment/discrimination. (*Id*. at p. 99.)

Prior to Ms. West's failure to report back to work, she had accumulated 2.0 points under Tyson's attendance policy during her probationary period. *See* Exhibit H. Ms. West was terminated for job abandonment on or about February 17, 2005 after being a "no call, no show" for four days. *See* Exhibit I.

### G. Ms. West's exit interview.

Ms. West returned to Tyson on payday, February 18, 2005, to pick up her final paycheck. (West Depo., p. 106.) Ms. West alleges she was told to go to Human Resources, where she met with Mr. Guizar. (*Id.* at p. 107; Plaintiff's Answer to Interrogatories No. 4 attached as Exhibit J.) Ms. West alleges she reported all of the alleged sexual harassment to Mr. Guizar, and identified George and Samwell. (*Id.*) She further alleges that she told Mr. Guizar that she spoke with Ms. Boykin, Mr. Parks, and Mr. Stokes about the alleged harassment. (*Id.* at p. 108.) Ms. West testified that she told Mr. Guizar that her husband wanted her to leave because he did not want her to work around "that kind of behavior and activity." (*Id.* at p. 109.) Ms. West testified that Mr. Guizar was apologetic, and told her that he would get to the bottom of it, and investigate after she left. (*Id.*)

Mr. Guizar's recollection of the exit interview is markedly different. Mr. Guizar testified that during the exit interview he asked Ms. West why she quit, and she said that she quit because

-9-

she was being harassed. (Guizar Depo., pp. 17-18; Excerpts of Mr. Guizar's deposition testimony are attached as Exhibit K.) Ms. West told Mr. Guizar that "all of the Hispanics were touching her behind." (*Id.* at pp. 26.) Mr. Guizar asked Ms. West if she had reported it to anybody, and who was harassing her. (*Id.* at p. 18.) Ms. West responded "forget it," and said that her husband wanted her to quit anyway. (*Id.*) Mr. West told Mr. Guizar that she had not reported the alleged harassment to her supervisor. (*Id.* at p. 28.) Mr. Guizar informed Ms. West that although she had quit, Tyson could still conduct an investigation, if they had names. (*Id.* at p. 30.) Ms. West was in a hurry to get out of Mr. Guizar's office, and left. (*Id.* at. p. 29.)

On April 6, 2005, Tyson received the EEOC Charge of Discrimination filed by Ms. West. Exhibit L. It was determined that Mr. Guizar had conducted Ms. West's exit interview, but the exit interview could not be located. Exhibit M. Based on Mr. Guizar's statement regarding the exit interview he conducted, and the allegations contained in the charge of Discrimination, Tyson commenced an investigation in to the allegations contained in the Charge of Discrimination. (Rackard Depo., pp. 18; Excerpts of Ms. Rackard's deposition testimony are attached as Exhibit N.) It was concluded that Ms. West's allegations could not be substantiated based on the witness interview statements, and the fact that no one witnessed the alleged harassment. (*Id.* at p. 54.) However, Tyson issued disciplines to Mr. Parks, Mr. Stokes, and Ms. Brown for failing to report the statements made by Ms. West to the Human Resources Department. Exhibit O.

## ARGUMENT[2]

I.  **Ms. West is not entitled to an adverse inference because it cannot establish that exit interviews notes were lost or destroyed in bad faith.**

An adverse inference instruction is only appropriate where a party loses or destroys

---

[2] While the plaintiff seeks an adverse inference for both the jury instructions, and the summary judgment phase, the plaintiff has failed to cite any authority to support that an adverse inference is proper at the summary judgment stage. In fact, Tyson's motion for summary judgment assumes for the purposes of that motion that her allegations are true.

evidence in bad faith. *Mills v. Commonwealth*, 170 S.W.3d 310, 332 (Ky. 2005); *Estep v. Commonwealth*, 64 S.W.3d 805, 810 (Ky. 2002)("absent some degree of bad faith, [a party] is not entitled to an instruction that the jury may draw an adverse inference from [another party's failure to collect or preserve evidence]"). The courts define spoliation of evidence as "the **intentional** destruction of evidence that is presumed to be favorable to the party responsible for the destruction." *Louisville Gas & Elec. Co. v. Continental Field Systems, Inc.*, 420 F. Supp.2d 764, 767 (W.D. Ky. 2005)(emphasis added)(quoting *Beck v. Haik*, 377 F.3d 624, 641 (6th Cir. 2004)). Thus, the key consideration in any spoliation analysis is not that the evidence was allegedly destroyed, but the circumstances or motivation behind the alleged destruction. *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002). That is, the party destroying the evidence must have done so in bad faith. Ms. West cannot show that the evidence was lost or destroyed in bad faith.

Tyson conducts exit interviews of employees to determine how to improve the workplace, and why employees are terminated or quit. (Guizar Depo., pp. 21-22.) Notes from the exit interview are placed on a form, and entered into the computer system. (*Id.* at pp. 22-23.) In the instant case, Mr. Guizar testified that on or about February 18, 2005, he conducted an exit interview of Ms. West, and filled out an exit interview form. (*Id.* at p. 22.) After the interview, Mr. Guizar placed the exit interview form in a tray where the human resources clerks would enter the information into the computer system. (*Id.* at pp. 22-23.) Mr. Guizar testified that he never saw the exit interview again. (*Id.*)

Ms. West does not allege, nor can she prove that Tyson intentionally lost the exit interview form. *See generally,* the Plaintiff's Motion. In fact, Ms. West states that the exit interview notes were "negligently lost or misplaced." *Id.* at p. 1. Thus, Ms. West is not entitled

to an adverse inference instruction.

**II.     Ms. West is not entitled to an adverse inference because she cannot establish that Tyson loss of the exit interview notes prevents her from establishing an essential element of her claim.**

Ms. West argues that pursuant to Kentucky law, she is entitled to an adverse inference instruction that would allow the jury to infer that the evidence contained in the exit interview would have been adverse to Tyson and helpful to her case. *See* Plaintiff's Motion, pp. 5-6. Ms. West further argues that the negligent loss of evidence is sufficient to support an adverse inference instruction. *Id.*

Even if the Court were to hold that the negligent loss of the exit interview notes is sufficient for spoliation, Ms. West cannot meet her burden under that standard. "When … a plaintiff is unable to prove **an essential element of her case** due to the negligent loss or destruction of evidence by an opposing party, … it is proper for the trial court to create a rebuttable presumption that establishes the missing elements of the plaintiff's case **that could only have been proven by the availability of the missing evidence**." *Rogers v. T.J. Sampson Community Hosp.*, 276 F.3d 228, 232 (6th Cir. 2002)(quoting *Welsh v. United States*, 844 F.2d 1239, 1248)(emphasis added). Thus, Ms. West is required to show that she cannot prove an essential element of her claim because of the lost evidence, and that the essential element could only be proven by the lost evidence. Ms. West cannot meet this burden.

To establish a *prima facie* case of sexual harassment, Ms. West is required to prove each of the following elements: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (5) the employer is vicariously liable. *Valentine-Johnson v. Roche*, 386 F.3d 800, 813-14(6th Cir. 2004); *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872 (6th Cir. 1997).

The only element Ms. West could claim is affected by the loss of the exit interview notes is the fifth element, Tyson's vicarious liability. Ms. West alleges that the exit interview notes would show that she informed Mr. Guizar that she complained to her supervisor, Mr. Parks, and that she identified each incident of alleged harassment and her alleged harassers. *See* Plaintiff's Motion, pp. 2-3. This argument lacks merit.

First, the exit interview notes would not prove that she complained to Mr. Parks about the alleged sexual harassment. Mr. Parks testified that on a single occasion Ms. West told him that when she worked on a particular line Hispanic guys would "whoop and holler" at her, but that she refused his offer to take her to Human Resources to file a complaint. (Parks Depo., p. 12.) Mr. Parks also testified that Ms. West refused to identify any of the individuals who were allegedly whooping and hollering at her, and stated that she did not want to pursue it. (*Id.* at pp. 22-23.) Ms. West, on the other hand, alleges that she informed Mr. Parks of all the alleged harassment she suffered during her first three weeks on the floor, and also specifically identified George, an employee who allegedly requested a sexual favor from Ms. West. (West Depo., p. 65.) Clearly, the exit interview notes would not prove whether or not Ms. West actually complained to Mr. Parks regarding all of the alleged incidents, or whether she identified George or any other alleged harassers to Mr. Parks. Rather, it would put the parties in the same situation they are in now, with conflicting witness testimony on what was actually stated.

Second, Ms. West's argument that the lost exit interview notes would show that she reported each incident of alleged sexual harassment, the identity of the alleged harassers, and the names of individuals she allegedly reported the incidents to, also fails.[3]

The undisputed evidence shows that Ms. West did not return to Tyson on February 18,

---

[3] This is an obvious attempt to circumvent her unreasonable failure to follow Tyson's reporting procedures, and to gain support for her argument that Tyson failed to promptly take corrective action to end any alleged sexual harassment.

-13-

2005, to conduct an exit interview. She simply came to pick up her paycheck. (West Depo., p. 111.) However, Tyson took the initiative to try to determine why Ms. West failed to return to work. (*Id.* at p. 107; Exhibit J.) The evidence is clear that had Ms. West not been required to go to the Human Resources department to speak with Mr. Guizar before receiving her paycheck, the alleged complaints would have never been made. Ms. West now attempts to obtain an adverse inference that the missing exit interview notes from that meeting were favorable to her version of what was said, and unfavorable to Tyson. Ms. West clearly is not entitled to such an inference.

It is true that Mr. Guizar's and Ms. West's account of what was said during the exit interview are dramatically different. It also true that the exit interview notes have been lost. However, Ms. West cannot establish that this entitles to her to an adverse instruction based on the contents of the missing exit interview notes. It is undisputed that Ms. West never saw or read the notes taken by Mr. Guizar during the exit interview. Thus, Ms. West cannot attest to the content of those notes, whether favorable to her or not. Only Mr. Guizar, the person who actually took the notes, can attest to what he wrote.

In fact, the notes themselves are a red herring. The true issue here is what was actually said during the exit interview. Were this an issue of Tyson losing a written complaint authored by Ms. West, and now denying her version of the contents of that writing, the issue would be different. Here, both Mr. Guizar and Ms. West have testified in their depositions as to their recollections of what was said during the exit interview. The same can be done at trial. Both Mr. Guizar and Ms. West will be able to tell the jury their version of what was said during the exit interview, and it will be for the jury to decide whether it believes Ms. West's account of the exit interview, or Mr. Guizar's. However, to instruct the jury to accept Ms. West's version of writing that she neither authored or reviewed would be improper. Accordingly, Ms. West's

motion for an adverse inference should be denied.

Third, this case is clearly distinguishable from the cases cited by Ms. West in support of her argument for an adverse inference. In each of those cases, the lost or destroyed evidence was crucial to the parties ability to support or refute the claims asserted against them. *See One Beacon Insurance Company v. Broadcast Development Group, Inc.,* 147 Fed. Appx. 535 (6th Cir. 2005) (destruction of sections of tower which collapsed that would have allowed testing alternative reasons for the tower's collapse); *Rogers v. T.J. Sampson Community Hosp.,* 276 F , 228 (6th Cir. 2002) (hospital's destruction of amputated tissue where medical tests could have possibly shown the existence of the patients infection which led to his death)*; Monsanto Company v. Westing House Electric Corporation,* 950 S.W.2d 811 (Ky. 1997) (intentional destruction of relavant documents); *Tinsley v. Jackson,* 771 S.W.2d 331 (Ky. 1989) (potential *Brady* violation for loss of blood-stained sleeper where forensic examination could determine whether the blood was the result of spatter from a gunshot, or from the defendant picking up his child who was wearing the blood-stained sleeper); *Sanborn v. Commonwealth,* 754 S.W.2d 534 (Ky. 1988) (*Brady* violation for prosecutors intentional erasure of tape recorded statements of witnesses)*.* Thus, in each of those cases, the lost or destroyed evidence had the potential to prove or disprove case. Such is not the case here.

The lost exit interview notes in this case would not serve to assist Ms. West in proving any of the essential element of her claims against Tyson. Further, it is clear that any question regarding what was or was not said during the exit interview can easily be solicited from the testimony of Mr. Guizar and Ms. West at trial. Thus, Ms. West is not entitled to an adverse instruction for the alleged spoliation of evidence.

**III.** **Ms. West has not suffered any damage from the alleged spoliation of evidence.**

Ms. West argues that as a result of the loss of the exit interview notes, Tyson failed to

-15-

properly or promptly investigate her complaints, permitted the harassment to continue unabated, and forced her to endure months of unemployment and financial hardship. *See* Plaintiffs Motion, pp. 5. This arguments lack merit.

First, the exit interview took place more than a week after Ms. West abandoned her employment. Thus, it is clear that the plaintiff did not continue to be harassed after the exit interview. Second, because Ms. West was no longer an employee, there is no authority to support that Tyson had a duty to Ms. West under Title VII or the Kentucky Civil Rights Act. Furthermore, the undisputed evidence shows that upon receiving the EEOC complaint, Tyson interviewed numerous individuals, including Andrea Boykin, John Fellows, Odle Stokes, and Corey Parks, all of whom Ms. West identified as individuals who she allegedly complained to of sexual harassment. *See* Exhibit O. None of these witnesses stated during the investigation, or subsequently in their depositions in this matter, that they witnessed any of the alleged incidents of sexual harassment. *(Id.)* In fact, Ms. West admits in her deposition that these individuals did not witness any of the alleged sexual harassment. Thus, Ms. West cannot prove that had the investigation been conducted with the use of the exit interview notes that the results would have been any different.

Finally, Ms. West's allegation that the loss of the exit interview notes caused her to endure months of unemployment and financial hardship also lacks merit. Ms. West attempts to rely upon Ms. Rackard's testimony that **if** her claims were "substantiated" it would have offered her employment back. (Plaintiffs' Motion pp. 4-5.) However, Ms. Rackard testified that Tyson could not substantiate Ms. West's claims. (Rackard Depo., p. 54.) Further, Tyson interviewed each individual the plaintiff has testified she spoke with regarding the alleged sexual harassment during her employment with Tyson. All of the witnesses indicated that the information they had

-16-

regarding any alleged sexual harassment came from statements made to them by the plaintiff. Thus, Ms. West cannot show that her financial hardship and unemployment was in any way based on Tyson's allegedly deficient investigation, nor could she show that had the investigation been conducted with the use of the lost exit interview notes that the determination would have been any different.

Accordingly, Ms. West cannot show that she suffered any damage as a result of the alleged spoliation of evidence and, therefore, her motion for an adverse inference should be denied.

## CONCLUSION

Based on the forgoing, the plaintiff's motion for an adverse inference should be denied.

s/ Demetrius O. Holloway<br>
Shannon Antle Hamilton<br>
Demetrius O. Holloway<br>
STITES & HARBISON, PLLC<br>
400 West Market Street, Suite 1800<br>
Louisville, KY 40202-3352<br>
shamilton@stites.com<br>
dholloway@stites.com<br>
Telephone: (502) 587-3400<br>
COUNSEL FOR DEFENDANT, TYSON FOODS, INC.

CERTIFICATE OF SERVICE

 On September 7, 2007, I electronically filed the above pleading through the ECF system, which will send a notice of electronic filing to the following:

| | |
|---|---|
| W. Keith Ransdell, Esq. | Bradley P. Rhoads |
| 176 Pasadena Drive | Rhoads & Rhoads, P.S.C. |
| Building 1 | 115 E. Second Street, Suite 100, |
| Lexington, KY 40503 | Owensboro, Kentucky 42303 |
| Telephone: (859) 276-6262 | brad@rhoadsandrhoads.com |
| E-mail: keith@rwlaw.org | Co-Counsel for Plaintiff, Amanda West |
| Counsel For Plaintiff, Amanda West | |

        s/ Demetrius O. Holloway
        Demetrius O. Holloway