**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**OWENSBORO DIVISION**

**CIVIL ACTION NO. 4:05-cv-183M**

**AMANDA WEST**                                        **PLAINTIFF**


**V.**


**TYSON FOODS, INC.**                                  **DEFENDANT**

**MEMORANDUM OPINION AND ORDER**

Plaintiff Amanda West's ("West") claim of sexual harassment and constructive discharge under the Kentucky Civil Rights Act KRS 344 *et seq* and Title VII of the Civil Rights Act of 1964 was tried to a jury in April 2008. The jury returned a verdict on April 25, finding for her on both claims and awarding her $750,000 in compensatory damages, $130,363.29 in front and back pay, and $400,000 in punitive damages, which the Court capped at $300,000 pursuant to 42 U.S.C. § 1981a(b)(3). [DN 69, 71]. This matter is before the Court on Defendant Tyson Foods, Inc.'s ("Tyson") Motion for Judgment as a Matter of Law, or in the Alternative for a New Trial or Remittitur. See Fed. R. Civ. P. 50; Fed. R. Civ. P. 59. [DN 76]. For the reasons set forth below, Defendant's Motion for Judgment as a Matter of Law is **DENIED** as to liability but **GRANTED** with respect to the reduction of front pay to its present value of $63,322.87. Defendant's Motion for a New Trial or, in the Alternative, for Remittitur is **DENIED**.

# I. FACTS

West began working at the Tyson chicken processing plant in Robards, Kentucky on January 7, 2005. During the first week she attended an orientation that included training on workplace harassment and discrimination. (Transcript 1, p. 139). West received, read, and signed Tyson's Harassment and Discrimination Policy, which directed employees to report workplace harassment as follows:

> Contact your supervisor and/or local HR Manager. The HR Manager will promptly investigate and resolve the complaint as quickly as possible to effect prompt and effective remedial action if harassment is determined to have occurred. In no circumstances, shall the investigation take longer than two working weeks. In cases where the parties work in close proximity and/or reporting, there should be careful attention to address that working relationship in the interim. Once resolved, if the Team Member wants to appeal the resolution, the Team Member can go to step 2.

(Tyson Harassment/Discrimination Policy, DN 19, Ex. A, p.2).

After orientation, West was assigned to work the "de-boning" table during the second shift where most of the workers were Hispanic. West testified that within her first week of work, several Hispanic male employees began harassing her, telling her that she had a "nice ass," "big boobs," and that she was "sexy." (Transcript 1, p. 142-143). They would also "stare," "hoop and holler," and "wolf whistle" at her. (Id.) This behavior occurred on the processing floor, in the hallways, in the cafeteria, and in the locker room. (Id., p. 140-160).

During West's third week of work, a Hispanic male named George, who was her "de-boning" line lead, tried to kiss her and asked her if she would go home and "f-u-c-k him." (Id., p. 145-146). When she told him she had a husband and refused, "he just stood

there and kind of smiled [] creepily and . . . grabbed his private part and [] shook it . . . and said, 'suck my,' you know, 'd-i-c-k,'" while approximately eight other Hispanic men watched and "laugh[ed]." (Id.). West testified that she was "upset," "scared," "embarrassed," and "humiliated." (Id., p. 146). She started crying and began walking off the processing floor, heading out the door to Human Resources, when she was stopped by one of her trainers, Odell Stokes. (Id.) The two were shortly joined by West's supervisor Cory Parks. (Id. at 147). According to West, she told both men about all of the sexual harassment she had been subject to at Tyson, including the encounter with George that precipitated her complaint. (Id., p. 147-149). She pointed out several Hispanic employees who had been persistently harassing her, including another Tyson line leader named Samuel. (Id.). Initially, Parks responded to her complaint by saying, "Well, you just have to understand that's how [Hispanics] treat their women over there" and "you are hot." (Id., p. 148). By the end of the conversation, however, Parks told West that she should not go to Human Resources; that he would get to the bottom of it; and that he would move her to a workstation where she would not be so close to George. (Id., p. 148-149).

During her fourth week of work, West was approached by Sammuel in a hallway while she was on the way to the bathroom. (Id., p. 152-153). West testified that Sammuel pulled her to him, kissed her, touched her breasts, and grabbed her "butt." (Id.) She reported that she had similar encounters with two other Hispanic males in the locker room, and that after work in her fifth week, she was followed to her car by a male Hispanic employee who whistled at her, and gave her a "creepy smile." (Id., p. 155-160). Following this incident,

3

West testified that she was too scared to return to work.  Tyson reported that she was officially terminated for "job abandonment" after failing to call or show up for four days. (DN 19, Ex. H, Separation Notification Form).

About a week later, West went to see Human Resources Manager Ralph Guizar for an exit interview before she was allowed to pick up her final paycheck.  During that meeting, West  told Guizar about all of the sexual harassment she experienced during her time at Tyson and identified two of her harassers by name—George and Sammuel. (Transcript 1, p. 160-161).   According to West, Guizar wrote down everything she said, apologized repeatedly, and told her he would investigate her complaint. (Id.).  However, no investigation was initiated, and Guizar's notes from the interview were never found.  Although a six-page fax was sent to an EEOC Specialist at Tyson's world headquarters regarding Amanda West eight days later, that fax, according to Tyson, was a mistake and only the cover sheet was actually sent.  Several weeks later, Tyson received an EEOC complaint filed by Amanda West.

## II. DISCUSSION

A. Judgment as a Matter of Law

Tyson's motion for "judgment notwithstanding the verdict" is treated as a renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure. See Ford v. County of Grand Traverse, 535 F.3d 483, 488 (6th Cir. 2008).  A Rule 50(b) motion may be granted where the Plaintiff was fully heard on an issue at trial and there was no legally sufficient evidentiary basis for a reasonable jury to find in his favor. Fed.

R. Civ. P. 50(a)(1).  In reviewing such motions, the Court views the evidence in the light most favorable to the non-moving party and gives him the benefit of all reasonable inferences.  It does not weigh the evidence, evaluate the credibility of the witnesses, or substitute its judgment for that of the jury. Tarrant Service Agency v. American Standard, Inc., 12 F.3d 609, 613 (6th Cir. 1993).  Defendant in this case argues that there was insufficient evidence adduced at trial to support Plaintiff's sexual harassment and constructive discharge claims and front pay and punitive damage awards.  The Court addresses each of these arguments in turn.

1. Sexual Harassment

Tyson contends that West failed to present sufficient evidence to sustain her sexual harassment claim.  To prevail in a sexual harassment suit under Title VII, a plaintiff must show that: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was so severe or pervasive that it created a hostile work environment; and (5) the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action. See Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999); Blankenship v. Parke Care Ctrs., Inc., 123 F.3d 868, 872 (6th Cir. 1997).  Tyson argues that West failed to carry this burden for three reasons discussed below.

(a) West's testimony was insufficient evidence of harassment

Tyson contends that the lack of corroborating witnesses to the incidents of sexual harassment means that West did not offer sufficient evidence for the jury to find harassment

5

occurred.  However, whether West called additional witnesses at trial that saw or heard the harassment is irrelevant.  West's testimony, by itself, is legally sufficient to establish her claim. See Fed. Rules Evid. 601-602.  She testified as to her direct experiences in suffering the harassment and presented evidence of contemporaneous reporting to both co-workers and management. Id.  Tyson, of course, was free to argue to the jury that West's credibility could be questioned in the absence of other direct witnesses, but it cannot now contend that her testimony is insufficient as a matter of law.

(b) There was insufficient evidence for the jury to find a hostile work environment

Tyson argues that the evidence presented at trial was legally insufficient to show a hostile work environment for purposes of a sexual harassment claim under Title VII.  Sexual harassment creates a hostile work environment when, based upon a totality of the circumstances, "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Williams v. General Motors Corp., 187 F.3d 553, 560  (6th Cir. 1999).  Whether an environment is hostile or abusive must be determined by considering "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or intimidating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance." Harris, 510 U.S. at 23; Randolph v. Ohio Dep't of Youth Services, 453 F.3d 724, 733 (6th Cir. 2006).  Both an objective and subjective test must be met: "the conduct must be so severe or pervasive as to constitute a hostile or abusive working

6

environment both to the reasonable person and to the actual victim." Randolph, 453 F.3d at 733 (citing Harris, 510 U.S. at 21-22).

Tyson argues that that standard was not met here because "the evidence is undisputed that [West] complained to Tyson on only one occasion, and that she only complained about alleged inappropriate comments – hardly rising to the level of objectively and subjectively severe and pervasive as required by law." (Defendant's Brief, p. 5). To support its claim, Tyson analogizes the instant case to Burnett v. Tyco Corp., 203 F.3d 980 (6th Cir. 2000) and Morris v. Oldham County Fiscal Court, 201 F.3d 784 (6th Cir. 2000). (Id.) In the former, the Sixth Circuit found that three alleged episodes of harassment by a personnel manager occurring over six-month period were not sufficiently severe or pervasive to create a hostile work environment; and, in the latter, the court held similarly with respect to "several dirty jokes [] told in [the] plaintiff's presence;" an "alleged verbal sexual advance related to plaintiff's evaluation;" a one-time reference to plaintiff as "Hot Lips;" and "isolated comments about plaintiff's state of dress." Burnett, 203 F.3d at 980; Morris, 201 F.3d at 784.

Unlike those cases, however, West presented significant evidence that the co-worker harassment was objectively and subjectively severe or pervasive here. She testified to unwanted physical, sexual contact by George, Samuel, and other Hispanic male employees, as well as wolf whistles, stares, gestures, and offensive sexual comments. (Transcript 1, p. 142-159). According to West, the sum total of these incidents was somewhere between 250 and 375 over the course of five weeks of work. (Transcript 1, p. 122). Moreover, West offered evidence that at least one other female employee experienced similar comments,

winks, and whistles every shift. (Transcript 2, p. 15).  In light of the frequency of these incidents, and the aggressive, physical nature of several of the attacks against West, the Court finds that the jury could reasonably conclude that the harassment was sufficiently severe or pervasive to create a hostile work environment for purposes of West's sexual harassment claim under Title VII.

(c) West failed to show that Tyson knew of the sexual harassment

Tyson contends that West failed to show that Tyson knew or should have known of the harassment.  It argues that it did not have actual knowledge because (1) West never reported the alleged incidents of physical contact; (2) she did not complain about being followed to her car; and (3) there is no evidence that Tyson managers or supervisors witnessed any of the unreported incidents or otherwise had actual knowledge of them.  Tyson further contends that West failed to prove that Tyson "should have known" about the alleged harassment because she only made a single complaint to Parks and only Andrea Boyken of all the witnessses testified that she had been subject to similar whistling and comments in the workplace.  Moreover, even if it did have notice, Tyson argues that Parks's reassignment of West to another line and alleged monitoring of her discharged its duty to take prompt and appropriate corrective action.

The Court disagrees with these contentions.  As an initial matter, it was reasonable for the jury to conclude that Tyson had actual knowledge because West told Parks about the sexual harassment, and Parks, as West's supervisor, was a proper contact on the Tyson sexual harassment policy (Transcript 1, p. 140); see Coates v. Sundor Brands, Inc., 164 F.3d 1361,

8

1364 (11th Cir.1999) (holding that when an employer designates certain employees as implementors of its policy, when those employees become aware of misconduct, the employer "has itself answered the question of when it would be deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures").  According to West, she told Parks about all of the harassment she experienced, including  the daily "comments," "stares," and "wolf whistles" from co-workers and the precipitating encounter where George tried to kiss her, asked her if she would go home and "f-u-c-k him," and "grabbed his private part and [] shook it at [her] and [] said, 'suck my,' you know, 'd-i-c-k.'" (Id., p. 145-146).  Because Parks knew of this harassment, the jury could reasonably have found that Tyson did as well.[1]

Moreover, the jury could reasonably have found that Parks's response was inadequate. When West first complained to Parks, his reaction was to tell her, "Well, you just have to understand that's how [Hispanics] treat their women over there" and "you are hot." (Id., p. 148).  When West persisted, Parks eventually acknowledged her concerns.  However, rather than go to Human Resources as he was required to do under the Tyson policy, Parks specifically told West not to go to Human Resources and that he would "take care of it." (Id.).  Unfortunately, West continued to experience the "same volume" of harassment by the "same people."  Accordingly, the jury had a reasonable basis to conclude that Parks's remedy was inadequate to discharge Tyson's duty to take prompt and appropriate corrective action.

---

[1] Having found one basis for liability, the Court need not speculate whether the jury could reasonably have found that Tyson "should have known" of the harassment.

2. Constructive Discharge

Tyson next argues that West failed to prove her constructive discharge claim. To prevail on that claim West must have shown that a "reasonable employee would have felt compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004). The employee's perception must be judged objectively, without consideration of his or her undue sensitivities. Henry v. Lennox Indus. Inc., 768 F.2d 746, 752 n. 3 (6th Cir. 1985). He or she has "an obligation not to assume the worst, and not to jump to conclusions too fast." Wilson v. Firestone Tire & Rubber Co., 932 F.2d 510, 515 (6th Cir. 1991) (quoting Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987)).

Construing every inference in favor of West, the Court finds that the jury could fairly conclude that a reasonable person would have felt compelled to resign. West properly reported relentless sexual harassment by George, Samuel, and other Hispanic male employees to her supervisor Cory Parks. (Transcript 1, p. 142-159). However, she received no remedy, no investigation, and the harassment not only continued unabated, but became increasingly worse. During her fourth week, West was approached by Sammuel, an individual she had reported to management by name, in a hallway while she was on the way to the bathroom. (Id., p. 152-153). According to West, Sammuel pulled her to him, kissed her, touched her breasts, and grabbed her "butt." (Id.) Later that week, two Hispanic males pushed her up against a locker and groped her while others watched and laughed. (Id., p. 155-156). Finally, in her fifth week, West was followed to her car in the middle of the night by a Hispanic male who wolf-whistled at her and gave her a "creepy smile." (Id., p. 158-160).

10

In light of this harassment, its escalation such that West legitimately feared for her safety, and Tyson's  failure to investigate, prevent, or remedy the harassment after West brought it to management's attention, the jury could conclude that conditions at Tyson were such that a reasonable person would have felt compelled to resign.

Tyson also contends that West failed to show that Tyson acted with the intention of forcing West to resign, or that her resignation was a foreseeable consequence of Tyson's actions. See Logan v. Denny's, Inc., 259 F.3d 558 (6th Cir. 2001); Moore v. KUKA Welding Systems & Robot Corp., 171 F.3d 1073 (6th Cir. 1999).  To the extent that Tyson was aware of the harassment and failed to take appropriate action to remedy it, the Court disagrees.  See II.A.1.(c) *supra*.  The jury could reasonably have found that it was foreseeable to Tyson that West would quit if it did virtually nothing to address or investigate West's claims.

3. Front Pay

Tyson contends that it is entitled to judgment as a matter of law on the issue of front pay because: (1) West's work history shows that an award of front pay for five years is both speculative and excessive; (2) it is speculative to conclude that she would have worked at Tyson for a total of eight years when the evidence shows that she was more than halfway to termination after just five weeks; and because (3) she received large compensatory and punitive damages awards.  The Court disagrees.

The purpose of front pay is to put an injured party in the same position they would have occupied in the absence of discrimination, nothing more and nothing less. Suggs v. Servicemaster Educ. Food Management, 72 F.3d 1228, 1234 (6th Cir. 1996).  "Several

11

factors must be considered when determining the propriety of an award of front pay, including 'an employee's duty to mitigate, the availability of employment opportunities, the period within which one by reasonable efforts may be re-employed, the employee's work and life expectancy, the discount tables to determine the present value of future damages, and other factors that are pertinent on prospective damage awards.'" Arban v. West Publishing Corp., 345 F.3d 390, 406 (6th Cir. 2003); see also Baker v. John Morrell & Co., 263 F. Supp. 2d 1161, 1176 (N.D. Iowa 2003) (other factors include the length of time plaintiff was employed by defendant, the likelihood plaintiff would have continued employment with defendant, plaintiff's at-will-employee status, the length of time other employees remained in that position, and the amount of other damages awarded to plaintiff).

Tyson's first argument that the award is too speculative and excessive in light of West's work history is unpersuasive. Tyson points to no authority for the proposition that an employee's previous work history with other employers is relevant to the award of front pay. Assuming that it is, however, the Court finds no compelling reason to conclude that it is dispositive here. As West observes, her earlier work history or lack thereof was predicated on financial and familial considerations that varied from those operating at the time she worked for Tyson. When she briefly worked for Kirlin's Hallmark from September 18, 2000 through January 18, 2001, she was in her early 20's, newly married, and with very young children at home. (Plaintiff's Response, p. 12). Moreover, unlike the Tyson job, the Kirlin's position was during the day, part-time, and at substantially less pay. (Transcript 1, p. 137-138). West's two-year stint at K & W Equipment from March 2002 to February 2004 was

12

likewise first shift and for less money. Id. By contrast, West testified that the Tyson job was "ideal" because it allowed her to work overtime and was second shift, which permitted both her and her husband to spend time with their children and avoid expensive child care costs. Id. Accordingly, the Court finds that the relatively short length of time West was employed in her prior positions does not compel a conclusion that the length of time she would have been employed at Tyson would have been similarly short had the harassment not occurred.

Tyson also makes much of West's absences during her first five weeks of employment. Tyson's attendance policy provides that a team member who accumulates three and one half attendance points during their 90-day probationary period will be terminated. (Defendant's Brief, Exhibit 3.). Tyson notes that by the time West's employment with Tyson ended, she had already accumulated two attendance points which were unrelated to the sexual harassment. (Defendant's Brief, Exhibit 4.). Tyson therefore concludes that the award of front pay was overly speculative because "after only 23 days of employment at Tyson, West was only 1 ½ attendance points away from being terminated for excessive absenteeism." (Defendant's Brief, p. 13). Although this is persuasive, it does not make the award of front pay too speculative as a matter of law. Given the evidence at trial that the job was "ideal" for West, that she was a "good worker" for Tyson, and that she performed above the required training standards, the jury could reasonably conclude that West would make it through the 90 day probationary period and would thus "probably . . . [be] a career employee." (Transcript 3, p. 31).

Tyson next contends, citing Carey v. Mt. Desert Island Hospital, 156 F.3d 31, 41 (1st

13

Cir. 1998), that West should not have received front pay because she received large compensatory and punitive damages awards. The Court disagrees. In Carey, the First Circuit *upheld* the trial judge's decision not to award front pay upon a finding that the plaintiff was fully compensated; it did not suggest that front pay was *necessarily* inappropriate in such circumstances, and the Court has found no basis in Sixth Circuit law for such a proposition. Id.; see also Selgas v. American Airlines, Inc., 104 F.3d 9, 12-13 (1st Cir.1997) ( "[t]rial courts have discretion to fashion awards in Title VII cases so as to fully compensate a plaintiff in a manner that suits the specific facts of the case"). In light of the jury's award and the evidence at trial, the Court declines to reduce or eliminate the award of front pay here.

Finally, Tyson argues that even if the Court declines to grant its motion for judgment as a matter of law on the issue of front pay, the award must be reduced to its present value using the appropriate discount tables. See Roush v. KFC National Management Co., 10 F.3d 392, 399 (6th Cir. 1993); Shore v. Federal Express Corp., 777 F.2d 1155, 1160 (6th Cir. 1985). According to Tyson's calculation, the jury's award of $64,545.00 in this case should thus be reduced to $63,322.87. The Court agrees. The front pay award is hereby reduced to $63,322.87 as requested.

4. Punitive Damages

Tyson contends that it is entitled to judgment as a matter of law on the award of punitive damages. A plaintiff is entitled to recover punitive damages if she can demonstrate by a preponderance of the evidence that the employer "engaged in a discriminatory practice . . . with malice or reckless indifference to the federally protected rights of an aggrieved

individual." 42 U.S.C. § 1981a(b)(1).  In Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999), the Supreme Court explained that "[t]he terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Id. at 535; see also Preferred Properties, Inc. v. Indian River Estates, Inc., 276 F.3d 790 (6th Cir. 2002).  Therefore, in order for an employer to be liable for punitive damages, its managerial agent acting within the scope of his authority must have operated in the face of a perceived risk that his conduct would violate federal law. Id. at 536, 542-43.  If the agent's conduct was contrary to the employer's good-faith efforts to comply with Title VII, however, the employer will not be liable. Id. at 546; see e.g., Fischer v. United Parcel Service, 2008 WL 880521, *10 (E.D. Mich. 2008). Nonetheless, an employer cannot escape liability for punitive damages by merely demonstrating that it has a written or formal anti-discrimination policy; it must demonstrate that it engaged in good faith efforts to implement that policy. Hall v. Consolidated Freightways Corp. of Delaware, 337 F.3d 669, 675 (6th Cir. 2002).

The evidence at trial, taken in the light most favorable to West, permits the jury's award of punitive damages.  It is undisputed that Parks was a managerial agent acting within the scope of his authority as a proper contact under Tyson's policy when West apprised him of the sexual harassment by George and others.[2]  In arguing that Parks's response was proper,

---

[2] To the extent Tyson suggests that Parks acted outside the scope of his authority in failing to follow Tyson's sexual harassment policy, the Court views Tyson's argument as one addressed to good faith.

or in other words in the absence of a perceived risk that his actions would violate federal law, Tyson relies on Parks's testimony that he monitored West to make sure she was not harassed and that West told him the harassment was "no big deal." (Defendant's Brief, p. 15). The Court finds this argument unpersuasive.

For one thing, it is far from clear that the jury believed Parks's testimony. See part II.A.1.(c) *supra*. More importantly, however, the evidence showed that Parks failed to report the harassment to Human Resources as he was required to do under the Tyson policy, and that he failed to talk to George, or Sammuel, or any of the other alleged harassers in order to stop the harassment. In light of these facts, the jury could reasonably have found that Parks acted in the face of a perceived risk that his conduct would violate federal law by failing to take appropriate action to address the hostile work environment.

Furthermore, despite Tyson's contention that Parks's treatment of West was contrary to the employer's good-faith efforts to comply with Title VII, the jury had an ample basis to conclude otherwise. Kolstad, 527 U.S. at 545. West testified that she told Guizar about every incident of harassment she experienced at Tyson—from the wolf whistles, to the comments, to the groping, to the man with the "creepy grin" following her to her car. (Transcript 1, p. 162). According to West, the interview lasted for thirty to forty-five minutes, Guizar took two pages of notes, and he repeatedly apologized and promised to start an investigation. (Id.). Eight days after West's meeting with Guizar a fax cover sheet for a six-page "urgent" message regarding Amanda West was sent from the Robard's Human Resources Department to Linda Walker, an EEO specialist at Tyson's world headquarters. (Transcript 3, p. 63-72).

16

Despite this fax, which, like Guizar's notes was never found, and despite Guizar's promise, no investigation was conducted until after West filed a complaint with the EEOC several weeks later.[3]

The investigation that followed was notably flawed.  Most saliently, Tyson delayed questioning any Hispanic employees until months after receipt of the EEOC charge despite an incredibly high turnover rate and its own policy requiring an immediate investigation that had to be concluded in no more than two weeks.  It also failed to ask any of the Hispanics that were questioned whether they had *observed* any sexual harassment against West; nor did Tyson ever interview or discipline Samuel, despite West specifically naming him to both Parks and Guizar.  Further, Tyson designated Linda Bevels to investigate the complaints that West made to Guizar in the exit interview, yet it failed to provide Bevels with the relevant information: Bevels was never told (and did not know) that the harassers were Hispanic males; nor did she ever receive a reconstructed copy of Guizar's missing notes from West's exit interview. (Transcript 2, p. 172-179).  The upshot was that, based upon Bevels's investigation, Walker characterized West's complaints of sexual harassment in her response

---

[3] Perhaps, as Tyson now argues, it thought the question was moot since West had already quit her job by the time she met with Guizar.  However, under Tyson's own sexual harassment policy, the report to Guizar was sufficient by itself to require an immediate investigation of West's claims. (Transcript 2, p. 214-215).  Moreover, given West's previous report of the harassment to Parks, Tyson had a duty to West to investigate her claim.  Not least, it also had a duty to West's co-workers to deter future harassment by the same or other offenders. See e.g., Fuller v. City of Oakland, California, 47 F.3d 1522, 1528 (9th Cir. 1995) (the obligation to take prompt, remedial action is not discharged unless effective action is taken that satisfies the twin purposes of Title VII by ending the current harassment and deterring future harassment- by the same offender or others).

17

to the EEOC as "hooping and hollering," even though Tyson had knowledge via Parks and Guizar of West's complaints of sexual assault and battery from her co-workers. (Transcript 2, p. 226-227).

Taken individually, many of these failings might be construed as negligence by Tyson. Taken collectively, however, there is no question that the jury had a reasonable basis for concluding that Tyson did not use good faith efforts to comply with Title VII, but rather had a sexual harassment policy that it chose not enforce. Accordingly, the evidence at trial was sufficient to sustain the jury's award of punitive damages.

B. New Trial

In the alternative, Tyson moves for a new trial under Fed. R. Civ. P. 59(a). "[A] new trial is warranted when a jury has reached a 'seriously erroneous result' as evidenced by: the verdict being against the weight of the evidence; the damages being excessive; or the trial being unfair to the moving party in some fashion, i.e., the proceedings being influenced by prejudice or bias." Holmes v. City of Massillon, Ohio, 78 F.3d 1041, 1045-46 (6th Cir. 1996), cert. den., 519 U.S. 935 (1996). The burden is upon the moving party to show that it suffered prejudice. Tompkin v. Philip Morris USA, Inc., 362 F.3d 882, 891 (6th Cir. 2004). Here, Tyson argues that a new trial should be granted because (1) the Court allowed in evidence related to West's complaint to Guizar; (2) it gave an adverse inference instruction regarding Guizar's missing exit interview notes; and (3) the damage award was a result of bias or prejudice. The Court addresses these arguments in turn.

18

1. West's Complaint to Guizar

Tyson argues that evidence of West's complaint to Guizar was prejudicial error because the meeting occurred after West had abandoned her employment with Tyson and was therefore irrelevant to her claims of harassment and constructive discharge. In the Sixth Circuit, where a party claims prejudice due to the trial court's alleged erroneous admission or exclusion of evidence, the moving party must show not only that the evidence was admitted in error but also that the evidence would have affected the outcome of the trial. Morales v. American Honda Motor Co., Inc., 151 F.3d 500, 514 (6th Cir. 1998). Here, the Court reaches only the first question because it finds no error. At a minimum, West's interview with Guizar was admissible to rebut Tyson's assertion of "good faith" compliance with Title VII for purposes of punitive damages. Accordingly, whether that evidence was admissible on some other basis, or whether the admission was prejudicial is moot.

2. Adverse Inference Instruction

Tyson next contends that it should receive a new trial because the Court gave the jury an adverse inference instruction regarding Guizar's missing notes from West's exit interview. Under Federal Rule of Evidence 302, the effect of a presumption in a federal civil case is to be determined in accordance with state law. Fed. R. Evid. 302. Kentucky law, which applies here, provides that an adverse inference instruction is the proper remedy for spoliation of evidence. According to the Kentucky Supreme Court, "Where the issue of destroyed or missing evidence has arisen, we have chosen to remedy the matter through evidentiary rules and 'missing evidence' instructions." Monsanto Co. v. Westinghouse Elec. Corp., 950

S.W.2d 811, 815 (Ky. 1997) (citing <u>Tinsley v. Jackson</u>, 771 S.W.2d 331, 332 (Ky. 1989) (holding, where evidence was "lost," though not by misconduct, that trial court should evaluate prejudice and consider a "missing evidence instruction" or limitation on other evidence)); <u>accord</u> <u>One Beacon Insurance Co. v. Broadcast Development Group, Inc.</u>, 147 Fed. Appx. 535, 540 (6th Cir. 2005).

> In the instant case, the Court instructed the jury that:

> Mr. Guizar's notes from the exit interview with Amanda West are missing. If you believe that the notes are missing as the result of the unjustified or careless actions or inactions of Tyson Foods, or any of its agents, then you may, but are not required to, draw an inference that the missing evidence would be favorable to the Plaintiff and adverse to the Defendant.

(See Jury Instruction No. 7).

Tyson argues that the notes were irrelevant for the same reason it alleged error with respect to the admission of evidence about the meeting between West and Guizar: West was no longer employed at the time the meeting took place. The Court, again, must disagree. Like other evidence about the meeting between Guizar and West, Guizar's notes were relevant regarding Tyson's notice and failure to act in good faith for purposes of West's punitive damage award as discussed in part II.A.4, *supra*. According to West, Guizar wrote down everything she said, including comprehensive details about the sexual harassment. As mentioned, however, Tyson failed to acknowledge notice of these details in its EEOC report, construing West's complaint as one for "hooping and hollering," rather than one involving allegations of repeated physical assault. The notes were therefore "significant evidence" for West's claim (insofar as they cast doubt on Tyson's assertion of good faith compliance with

Title VII) that was apparently "lost" by Tyson. See Tinsley, 771 S.W.2d at 332. Therefore, the Court finds that the adverse inference instruction was proper under Kentucky law.

3. Prejudice or Bias

Tyson also claims that it is entitled to a new trial because of "the passion, bias, and prejudice deliberately fostered by Ms. West against Hispanic employees and those who employ them." (Defendant's Brief, p. 29). Defendant contends that the trial was "permeated" with statements such as "I couldn't believe this could happen to an American woman . . ." and references to "the Hispanics" or "the Mexicans." Id. It observes that Guizar was asked about his prior work in recruiting Hispanic employees before coming to Tyson, and that other witnesses were asked whether they heard Parks speaking Spanish with the Hispanic employees or conversing with Guizar in Spanish, or whether Tyson provided a bus to pick up Hispanic employees for work. Id. According to Tyson, these questions and references were "a calculated effort to enflame the jury against Tyson by playing on the same emotions that have triggered the ongoing national debate about our immigration laws . . . [and] ultimately resulted in an adverse judgment against Tyson, in grossly excessive compensatory and punitive damages awards and a speculative and excessive front pay award." Id. The Court disagrees.

The jury's verdict was not based upon passion, bias, or prejudice against Hispanic employees such that a new trial is appropriate here. See generally Holmes, 78 F.3d at 1045-46. Contrary to Tyson's assertion, the trial was not "permeated" with racial or ethnic hostility by West; rather, references to "Hispanics" could not be avoided given the nature of

21

the evidence and the symptoms of West's lingering emotional distress.  Moreover, while questions from West's counsel may have occasionally missed the mark, the Court does not find them to be a "calculated" effort to "enflame" the jury.  The question regarding Parks's fluency in Spanish, for example, was based upon information and belief that Parks's fluency was greater than was admitted at trial, which would have been relevant to his ability to understand comments directed in Spanish at West while they worked on the processing floor together.  Likewise, the question about whether Tyson had invested in private transportation for its Hispanic workforce was reasonably prompted by evidence that Tyson was unwilling to discipline or retrain any of its Hispanic employees for wrongdoing related to West's harassment, including Guizar, George, and Samuel.  Finally, counsel's questions regarding Guizar's previous employment history were consistent with West's general inquiry into the qualifications of Tyson's human resources staff as a reflection of Tyson's commitment (or non-commitment) to enforcing its sexual harassment policy.  A new trial is therefore inappropriate.

C. Remittitur

Alternatively, Tyson requests that the Court remit the damage awards.  In the Sixth Circuit, "[a] trial court is within its discretion in remitting a verdict only when, after reviewing all evidence in the light most favorable to the awardee, it is convinced that the verdict is clearly excessive, resulted from passion, bias or prejudice; or is so excessive or inadequate as to shock the judicial conscience of the court." Gregory v. Shelby County, 220 F.3d 433, 443 (6th Cir. 2000); Slayton v. Ohio Dep't of Youth Services, 206 F.3d 669, 679

(6th Cir. 2000). For the reasons detailed below, the Court declines to remit the jury's awards of compensatory and punitive damages.

1. Compensatory Damages

Tyson gives four reasons why the compensatory damage award should be remitted: (a) it was beyond the range supported by the evidence at trial; (b) it shocks the conscience; (c) it was outside the range argued by West's counsel; and (d) comparable cases demonstrate that the award is excessive. The Court treats, and rejects, each of these arguments as follows.

(a) The award was beyond the range supported by the evidence

Tyson argues that the compensatory damage award was beyond the range supported by the evidence at trial. The Court disagrees. The evidence showed that West experienced a minimum of 250 physical and non-physical incidents of sexual harassment while working at Tyson that resulted in significant contemporaneous and permanent emotional distress. As those incidents are adequately covered elsewhere in the opinion, the Court will not recount them here. Suffice it to say that the distress reasonably and actually caused by these incidents was substantial: West appeared visibly threatened to co-workers; she sought refuge from a sexual assault in Tyson's bathroom; she often went home in tears; she was terrified and shaking when she was followed to her car; and she is now more fearful and less trusting, intimidated and anxious about being around groups of men in general, and Hispanic men in particular, and has lost her "spark." (Transcript 2, p. 277); see Carey v. Piphus, 435 U.S. 247, 263 n.20 (1978); Turic v. Hoiland Hospitality, Inc., 85 F.3d 1211, 1215 (6th Cir.1996). Accordingly, the Court finds the compensatory damage award was adequately supported by

23

the evidence as compensation for West's mental distress.

(b) The compensatory damage award shocks the conscience

Tyson next contends that the compensatory damage award shocks the conscience. To that end, it notes that West only worked for Tyson for five weeks and that Tyson did not have any knowledge of the groping, touching, or the parking lot incident during West's employment with Tyson. It concludes, therefore, that the award "does not appear to be an attempt to compensate Ms. West, but an attempt to punish Tyson for hiring Hispanic workers." (Defendant's Brief, p. 23). The Court cannot agree. The evidence of distress presented by Amanda West, her husband, co-workers, and her aunt Bonnie Terizzi just recited in part (a) *supra* directly refutes Tyson's argument. Thus, the Court finds that the jury's compensatory damage award does not shock the conscience.

(c) The award should be remitted because higher than the amount demanded

Tyson also claims that the compensatory damage award should be remitted because it was outside the range argued by West's counsel. Tyson points the Court to <u>Denhof v. City of Grand Rapids</u>, 494 F.3d 534 (6th Cir. 2007), where two female police offers brought Title VII retaliation claims against the Grand Rapids Police Department seeking $500,000 each in compensatory damages for humiliation and mental anguish. After the jury awarded each plaintiff $1 million, the district court held that the awards were excessive and remitted them to $350,000 a piece. <u>Id.</u> at 547. The Sixth Circuit affirmed the remittitur, holding that it was difficult to see how remitting an award of two times the amount suggested by plaintiffs' own counsel could constitute an *abuse of discretion* since the plaintiffs' attorneys presumably

24

requested the amount of damages they believed were supported by the evidence.  Tyson argues that, like the situation in Denhof, the compensatory damage award in the present case should be remitted since it was outside the range argued by West: West demanded $500,000 in compensatory damages for emotional distress and humiliation and the jury awarded $750,000.  Tyson concludes that "[t]his fact alone proves that the compensatory damage award was beyond the range supported by proof and demonstrates that the verdict was given under the influence of passion and prejudice." (Defendant's Brief, p. 24).

The Court, again, disagrees.  For one thing, Denhof cannot be read as standing for the proposition Defendant advances, i.e., that an award above counsel's request must be remitted. Indeed, the Sixth Circuit recognized quite the opposite when it stated: "A jury verdict should not be remitted '*unless* it is beyond the maximum damages that the jury could reasonably find to be compensatory for a party's loss.'" Id. at 547 (quotations omitted) (emphasis added).  The point is that counsel's estimate of damages, while arguably probative, is not the touchstone for remittitur of an award.  Having previously found the jury's award reasonable and not influenced by passion or bias, the Court declines Tyson's request to remit the award solely because it is higher than the amount demanded by West's counsel.

(d) Comparable cases show that the compensatory damage award is excessive.

Tyson further argues that "comparable cases demonstrate that the compensatory damage award is excessive." (Defendant's Brief, p. 24); see Bach v. First Union National Bank, 149 Fed. Appx. 354 (6th Cir. 2005).  To that end, it cites to a series of cases within the Sixth Circuit where, it contends, "compensatory damages awards in the $50,000-range is

25

more the norm." (Id.); see McCombs v. Meijer, Inc., 395 F.3d 346 (6th Cir. 2005); Thompson v. Thompson, 935 F.2d 271 (6th Cir. 1991); Steinhoff v. Upriver Restaurant Joint Venture, 117 F. Supp. 2d 598 (E.D. Ky. 2000).   In particular, Tyson contrasts the compensatory damages award in the present case with the award in Steinhoff.   There, the plaintiff alleged that she suffered sexual harassment and gender discrimination under Title VII of the Civil Rights Act of 1964 and the Kentucky Civil Rights Act while working as a waitress at "Hooters." 117 F. Supp. 2d at 600.   According to Steinhoff, at least two managers made "very offensive" sexual comments to her on a daily basis, and one manager "put his hand in her shorts, pulled out her pantyhose, and looked down in them." Id. at 600-01.   As a result, Steinhoff prevailed on her sexual harassment qua hostile work environment claim and was awarded $25,000 in compensatory damages. Id. at 603.

Notwithstanding some superficial similarities between the harassment suffered by Steinhoff and West, however, there is an obvious explanation for the disparate awards: West suffered far more mental distress than Steinhoff.   While West produced evidence of various episodes of contemporaneous terror, crying, sleeplessness, as well as evidence of lasting anxiety and personality and behavioral changes, the only evidence of emotional distress submitted by Steinhoff was her testimony that the harassment made her feel "like a piece of meat, degraded, violated" and that it "interfered with her job performance." Id.

To the extent that awards in other cases are probative of the reasonableness of the award in the instant case at all, see Moody v. Pepsi-Cola Metropolitan Bottling Company, Inc., 915 F.2d 201, 211 (6th Cir. 1990), the Court finds the $650,000 award for emotional

distress in <u>Fischer v. United Parcel Service</u>, 2008 WL 880521 (E.D. Mich.) more comparable. <u>Id.</u> at *10-11 (upholding award where plaintiff's firing was "horrible" and "depressing;" he was unable to find any other employment for one year afterwards; and he ultimately found work in different industries which required him to live away from his family during the week and caused significant strain on his personal relationships). Accordingly, the Court holds that the award in this case is not out of line with awards in similar cases and declines to remit the award on that basis.

   2. Punitive Damages

   Tyson lastly contends that the jury's award of punitive damages should be remitted. It argues that it "produced substantial evidence of its efforts to comply with Title VII" and concludes that "the excessive award of punitive damages in such circumstances – indeed, any award of punitive damages – violates due process." (Defendant's Brief, p. 28). As recounted in part II.A.4 *supra*, the evidence at trial was to the contrary. Therefore, the Court denies Tyson's request for remittitur of the punitive damages award.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Judgment as a Matter of Law is **DENIED** as to liability but **GRANTED** with respect to the reduction of front pay to its present value of $63,322.87.  Defendant's Motion for a New Trial or, in the Alternative, for Remittitur is **DENIED**.

cc: Counsel of Record